Filed 8/1/11

# IN THE SUPREME COURT OF CALIFORNIA

ROBERT E. STARK, )
)
      Petitioner, )
) S145337
      v. )
) Ct.App. 3  C051073, C051074
THE SUPERIOR COURT OF SUTTER )
COUNTY, )
) Sutter County Super. Ct. Nos.
      Respondent; ) CRMS051001,
) CRMS051031
THE PEOPLE, )
)
      Real Party in Interest. )
_____)

This case involves serious allegations against Robert E. Stark, the auditor-controller of Sutter County. In that position, Stark made decisions about allocations and expenditures of public money. Stark had significant disagreements with the Sutter County Board of Supervisors (Board) and the County Administrative Office (CAO) regarding questions of public finance. The Sutter County District Attorney's Office claims that Stark violated statutes, county rules and Board resolutions detailing the requirements of his office. Stark asserts the matters at issue were complex transactions in which he exercised his professional judgment as auditor-controller and handled the matters as the law and governmental accounting rules required. A grand jury ultimately indicted Stark on

1

13 counts of violating Penal Code section 424[1] for acts and omissions involving public funds between 2003 and 2005. The grand jury additionally returned a 15-count accusation under Government Code section 3060 for willful or corrupt misconduct that could lead to Stark's removal from office. We granted review to resolve the following questions:

1. Does a violation of section 424 require intentional violation of a known legal duty or is it a general intent crime?

2. May a defendant move to set aside an indictment under section 995, subdivision (a)(1)(B), on the ground that grand jurors were misinstructed on the scienter required to establish an element of the charged offense?

3. May a public official be removed from office pursuant to Government Code section 3060 in the absence of proof of a purposeful refusal to follow the law in carrying out the duties of his or her office?

4. When a defendant moves to set aside an indictment or accusation on the ground that the district attorney's participation in the grand jury proceedings created a potential for bias or the appearance of a conflict of interest, must the defendant satisfy the requirements for disqualification set forth in section 1424?

We resolve these questions as follows:

1. At issue here are four provisions of section 424, all of which proscribe general intent offenses. Three of those provisions criminalize acting without authority or failing to act as required by law or legal duty. We conclude those offenses additionally require that the defendant knew, or was criminally negligent in failing to know, the legal requirements that governed the act or omission.

2. A claim of misinstruction on the mens rea of a crime may be challenged under section 995, subdivision (a)(1)(B). It raises the possibility that, as

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

2

instructed, the grand jury may have indicted on less than reasonable or probable cause.

3. Based on the record in this case, we need not and do not decide the question of whether willful misconduct under Government Code section 3060 requires a knowing and purposeful refusal to follow the law. Stark does not disagree with the instruction on mental state given by the district attorney to this grand jury. Rather, he claims that later closing argument by the district attorney and accompanying PowerPoint slides invalidated the instruction on mental state, requiring that the accusation be set aside. We address this claim as to the district attorney's argument and PowerPoint slides and conclude that it is without merit.

4. In a motion to set aside an indictment or accusation, a defendant claiming that the district attorney suffered from a conflict of interest during the grand jury proceeding must establish that his right to due process was violated.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We begin with a general overview. The specific counts of the indictment and accusation that remain in this appeal will be described more thoroughly in the discussion section.

The Board consists of five elected members. Stark has served as the elected auditor-controller of Sutter County since 1985. His primary duty is to serve as the chief accounting officer for the county. Larry Combs was the county administrative officer during the period at issue here, with responsibility to manage the county for the Board. His duties included recommending and enforcing policy decisions, as well as recommending and managing the county budget.

On September 7, 2004, Combs presented a report to the Board entitled "Analysis of Performance of Auditor-Controller & Recommendation for Action." The report criticized Stark for actions dating back to 1988, and discussed recent

3

"serious problems" regarding his performance, which are the basis for some of the allegations in the indictment and accusation. Specifically, the report mentioned the following: Stark filed the final budget for fiscal year 2003-2004 six and one-half months late; Stark acted unilaterally in amending the county budget even though state law reserves that authority to the Board; Stark claimed he had the authority to approve the rates some county departments were charging other county departments for services provided; Stark withheld overtime pay from the county's firefighters in January 2003 based on his interpretation of the county's memorandum of understanding (MOU); and, in the final budget for 2003-2004, which Stark belatedly filed in June 2004, Stark unilaterally transferred money from the county's general fund reserve to Sutter County Waterworks District No. 1 (Waterworks District).

In fall 2004, the Sutter County Grand Jury, in its oversight function, began an informal investigation of the auditor-controller's office. The Sutter County District Attorney's Office was not involved in these proceedings. On February 9, 2005, the last day of the informal investigation, Stark appeared at the request of the grand jury and answered questions.

A formal grand jury proceeding began on March 3, 2005, conducted with the assistance of Sutter County District Attorney Carl Adams. Multiple days of testimony concluded on May 3, 2005. Additionally, the grand jury received exculpatory material from Stark.

On May 4, 2005, District Attorney Adams instructed the grand jury on 13 counts alleging violations of various provisions of Penal Code section 424 and 15 counts alleging willful and corrupt misconduct under Government Code section 3060. The grand jury returned the indictment and accusation on all counts.[2] The

---

[2] "An indictment is an accusation in writing, presented by the grand jury to a competent court, charging a person with a public offense." (§ 889.) Government Code section 3060 et seq. provides for the removal from office of "any officer of a

*(footnote continued on next page)*

4

indictment and accusation, for the most part, were based on the same acts and omissions.

Stark moved to set aside the indictment and objected to the accusation. The superior court set aside one count of the indictment and two counts of the accusation.

In the Court of Appeal, Stark sought a writ of mandate or prohibition to review the trial court's order. When the Court of Appeal summarily denied the petition, Stark filed for review here. We granted the petition and transferred the matter back to the Court of Appeal with directions to issue an order to show cause why the requested relief should not be granted. On remand, the Court of Appeal issued the order to show cause. The Court of Appeal concluded that six counts of the indictment should have been set aside, and issued a peremptory writ of mandate to correct those errors. It concluded the trial court did not err in denying Stark's motion to set aside the remaining counts of the accusation.

As to the issues for which we granted review, the Court of Appeal ruled that, as to certain provisions of section 424, a defendant must know that his actions or omissions regarding public funds are without legal authority. As to the remaining counts for which that mental state is required, the Court of Appeal concluded that grand jurors "could reasonably entertain a strong suspicion" that Stark had such knowledge.

Regarding Stark's claims of instructional error as to section 424, the Court of Appeal concluded that section 995 does not provide a basis to set aside the indictment on the ground of instructional error. The court held that Stark's claim

_____

*(footnote continued from previous page)*

district, county, or city . . . for willful or corrupt misconduct in office . . . ." (Gov. Code, § 3060.) Such a proceeding is initiated by the grand jury's presentation of an accusation against the official charged with misconduct. (*Ibid.*)

The grand jury also returned an accusation against assistant auditor Ronda Putnam. The Court of Appeal set aside the accusation against her.

was cognizable only as a potential violation of his right to due process, and that Stark failed to make such a showing.

As to the mental state required to support an accusation under Government Code section 3060, the Court of Appeal concluded that "[t]here must be willful behavior, and that behavior must amount to misconduct . . . ." Because Stark identified no authority permitting a challenge to the accusation for instructional error, the Court of Appeal rejected his attack on the prosecutor's instructions and comments to the grand jury. Even assuming Stark could argue that the instructions violated his due process rights, he made no such showing.

Finally, the Court of Appeal rejected Stark's argument that the mere appearance of a conflict of interest by the Sutter County District Attorney's Office during the grand jury proceeding could support a section 995 motion to set aside the indictment. The Court of Appeal concluded that such a claim was not cognizable under that statute, but must be brought as a challenge to the indictment on due process grounds. The Court of Appeal concluded that Stark's claim regarding the district attorney's office did not suffice to make such a showing.

## II. DISCUSSION

### A. Penal Code Section 424 — Mental State

Section 424 was enacted in 1872 as part of the original Penal Code. More than 80 years ago, this court explained in *People v. Dillon* (1926) 199 Cal. 1 (*Dillon*) that section 424 "has to do solely with the protection and safekeeping of public moneys as defined by section 426 of the Penal Code, and with the duties of the public officer charged with its custody or control . . . ." (*Dillon*, at p. 5.)[3]

---

[3]     Section 426 defines public moneys as follows:  "The phrase 'public moneys,' as used in Sections 424 and 425, includes all bonds and evidence of indebtedness, and all moneys belonging to the state, or any city, county, town, district, or public agency therein, and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity."

6

The current statute contains seven subparts, all of which were part of the statute as originally enacted, although renumbered by amendment in 1905. (Stats. 1905, ch. 59, § 1, pp. 53-54.) The remaining counts of the indictment allege violations of four of those provisions:[4]

"(a) Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either:

"1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another; or, [¶] . . . [¶]

"3. Knowingly keeps any false account, or makes any false entry or erasure in any account of or relating to the same; or, [¶] . . . [¶]

"6. Willfully omits to transfer the same, when transfer is required by law; or,

"7. Willfully omits or refuses to pay over to any officer or person authorized by law to receive the same, any money received by him or her under any duty imposed by law so to pay over the same; —

"Is punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state." (§ 424(a).)

### 1. The Indictment

We begin with a review of the evidence presented to the grand jury as to the counts of the indictment remaining on appeal.

#### a. Third Count (Section 424(a) 1)

The People claim that Stark misappropriated public money in violation of section 424(a) 1 when, without authorization by the Board, he transferred money

---

[4] Hereafter, we will refer to the various provisions of section 424 in the following form: section 424(a) 1, section 424(a) 3, etc.

in the 2003-2004[5] final budget from the county's general fund to the Waterworks District.

The county's annual budget is essentially an authorized spending plan for the year. The budget includes all of the operating departments of the county, as well as special districts over which the Board serves as the governing body. The budget is divided up into funds. Some funds consist of a single department. Others funds represent multiple departments. Assistant county administrator Curtis Coad testified, "We have to balance the budget. That means that in every fund in the budget the revenues have to equal the appropriations."

By June 30 of each year, the county administrative officer must submit a proposed budget to the Board. The Board then approves the proposed budget and holds budget hearings to be completed by August 30. By means of a final budget resolution, the Board must adopt the final budget by October 2. The auditor-controller then has until December 2 to publish the final budget and file it with the clerk of the Board.

County Administrator Combs testified that the final budget resolution authorizes the auditor-controller "to prepare the final budget with such adjustments as are necessary within restrictions that are contained in this resolution." Combs explained that the budget resolution authorizes two types of adjustments. First, the auditor-controller can "adjust interfund and intrafund accounts to reflect the effect of amendments and modifications adopted by the Board, and [can] adjust estimates of State and Federal revenue which are affected by the amendments and modifications, subject to review and approval by the County Administrative Officer." Second, the budget resolution allows the auditor-controller "to adjust the appropriation for contingencies in each fund, as necessary to balance the fund and the budget, and, if necessary, to balance any fund and

---

[5] The Sutter County fiscal year runs from July 1 to June 30.

8

reduce such fund's general reserve, subject to the review and approval of the County Administrative Officer." [6]

Various county funds maintain reserves. Within the county general fund there are several different reserves, such as those for capital expenditures and vehicle replacement. At issue in this count of the indictment is the general fund's general reserve (hereafter general reserve). The general reserve is subject to unique restrictions. The Board is legally authorized to reduce or increase the amount of the general reserve during the budget process. Once the final budget is adopted, however, that reserve can be accessed only in an emergency declared by a four-fifths vote of the Board.

One of the special districts governed by the Board is the Waterworks District, an enterprise fund that provides sewer and water services to the community of Robbins. Under an enterprise fund operation, people in the area pay for the cost of services. No money from the county general fund is required to operate the Waterworks District. The Waterworks District's sewer system was installed and purchased by a grant obtained by the county on behalf of the residents of Robbins. The Board had decided not to fund the depreciation of the sewer system because those expenses would have had to be financed by user fees, which the Board considered too burdensome for the area residents.

In fiscal year 2003-2004, Stark and the CAO had significant disagreements over accounting principles applicable to the Waterworks District. Stark's position was that the Waterworks District fund must be included in the county budget. Stark considered the depreciation of the water system an expense that had not been funded, resulting in an imbalance in the fund of $336,000. Because the

---

[6] The phrase "subject to review and approval by the County Administrative Officer" was specifically added to the 2004-2005 final budget resolution because, as explained by County Administrator Combs, Stark had made unauthorized changes to the 2003-2004 budget.

Waterworks District fund was out of balance, the county budget was out of balance as well.

The CAO disagreed. Assistant county administrator Coad told the grand jury that enterprise funds do not need to be included in the county budget, but the Waterworks District fund was included "more for public information and so we can include them in our hearing." Thus, if the Waterworks District fund was out of balance, it had no effect on the overall county budget.

When the final budget for the fiscal year 2003-2004 was released on June 14, 2004, the CAO discovered that the Waterworks District budget included a contribution from the county general fund of $336,485. Assistant county administrator Coad explained that Stark, through a series of transactions, took general reserve money, placed it into the general fund, and then transferred that money to the Waterworks District fund. As Coad explained, "Bottom line, he used general fund reserve money to balance the [Waterworks District] fund. And, no, we did not sign off on that."

Coad told the grand jury that nothing in the final budget resolution authorized Stark to transfer money from the general reserve, "which belonged to all the People of Sutter County," and give it to the Waterworks District serving the community of Robbins alone. Such a transfer from the general reserve required a vote of four-fifths of the Board and "special findings of general public benefit." The Board ordered Stark to return the money to the county's general fund. Stark complied.

On February 9, 2005, the grand jury interviewed Stark during its informal investigation before the criminal grand jury proceedings began. A copy of this transcript was entered into evidence during the criminal grand jury proceedings. During the interview Stark acknowledged that transfers from the general fund must be authorized by the Board, but stated he had been given this authorization. Stark elaborated on his answer. He told the grand jury that the Waterworks District was out of balance due to unfunded depreciation costs and advised the

10

CAO that "the debits don't equal the credits." Stark claimed that the proposed budget adopted by the Board specifically recommended a "transfer in" to the Waterworks District to balance the budget. Stark testified that after reviewing all the funds, he could not find "the recognition of the transfer-out that was the source of funds for the transfer-in for the [Waterworks District]." "And since I have to balance the budget . . . I set up the . . . transfer-out for the general fund, which was the only place the money could actually come from to balance [the Waterworks District]. [¶] And under the direction that the Board gives me to balance the budget, I can very well read that as saying that I was authorized to set that up and the Board did in fact approve that transfer." Stark told the grand jurors that under the final budget resolution, he is authorized by the Board to balance the budget and transfer money from the reserves.

### b. Ninth Count (Section 424(a) 6)

The ninth count of the indictment alleges that between March and May 2005 Stark violated section 424(a) 6 by "wilfully omit[ting] to transfer [public moneys], when transfer was required by law, to wit: post[ing] journal entries reflecting payment due and income earned by the Sutter County Department of Information Technology Services."

The Department of Information Technology (IT department) provides computer services for the entire county. The IT department collects payments for services provided to other county departments through "inter-fund charges." As we explain more fully below, rates for IT department services are set at least annually. When a county department is notified of an IT department billing, journal entries must be made by the auditor-controller to transfer money from the user department's budget to the IT department.

As of 2005, the IT department had been operating for five years. For the first four years, calculation of appropriate billing rates was accomplished through an informal process in which the IT department, Stark, and the CAO would agree

11

on a methodology. Stark would set the rates. However, on September 7, 2004, the Board delegated the authority to set rates to the county administrator.

At the beginning of 2004-2005 fiscal year, the IT department had approximately $400,000 to $500,000 carried over from the previous year because the department's revenue exceeded its expenses. The IT department operated on that money until the beginning of November 2004. Bernadette Kucharczuk, director of the IT department, explained that the department's revenue is never enough to maintain a positive cash flow to year end when all claims are eventually paid. In each preceding year, the IT department operated in the red. Final budgets for the IT department anticipate that it will operate in the red. Nevertheless, Stark had never refused to post entries in earlier years.

In the 2004-2005 fiscal year, the process for setting the IT department's billing rate began in December 2004. On January 18, 2005, County Administrator Combs forwarded the billing rates to Stark. The IT department then submitted journal entries to the auditor's office for payment of services it had rendered in the previous six months.

Stark refused to process the journal entries. Stark maintained that he needed adequate documentation to assess whether the rate changes were cost based and calculated in accordance with generally accepted accounting principles. On January 27, 2005, Stark requested that the IT department provide him additional information, including an accounting for certain costs, in order to "complete a thorough analysis of the rates submitted by the IT Department." Although the IT department responded, Stark notified Kucharczuk that the response was inadequate and requested more information. Kucharczuk responded to this request, and later provided additional information requested by Stark. Kucharczuk testified that although the rates changed "somewhat" in fiscal year 2004-2005, the methodology for setting the rates was the same as had been used for the previous four years. In those previous years, when Stark's office was

involved in the rate-setting process, journal entries were processed and claims paid.

County Administrator Combs notified Stark by letter on February 15, 2005, that Combs, in accordance with the authority delegated to him by the Board in September 2004, was approving the billing rates for the IT department that had been sent to Stark in January. Combs wrote that the rates were reasonable and followed the "rate methodology prescribed by your office." Combs stated that it was "imperative" that Stark process the journal entries immediately and pay any pending claims that were being held due to the department's deficit. Stark continued to refuse to post journal entries. As of March 3, 2005, when Kucharczuk first testified before the grand jury, the IT department was $600,000 in the red.

Additionally, at the beginning of February, Stark stopped paying the claims submitted by the IT department for services provided to the department by outside vendors. Kucharczuk was told by the auditor-controller's office that payment could not be made because the IT department had a deficit balance, a position Stark had not asserted in prior years. At the beginning of March, at least $185,000 in bills from outside vendors remained unpaid. At the same time, Stark was refusing to process journal entries for the IT department totaling more than $1 million.

On March 1, 2005, the Board directed Stark to make the journal entries for the first and second quarter of the fiscal year and to pay the outstanding claims against the IT department. Stark told the Board that he did not approve of the billing rates for processing the journal entries and was having difficulty obtaining documentation from the IT department in support of those rates. Kucharczuk told the Board that she had worked with Stark to provide him documentation. The next day, Stark told the county treasurer, Jim Stevens, that he would not process the journal entries because he disagreed with the billing rates. At the Board meeting on March 8, 2005, Stark informed the Board that he would not post the journal

13

entries for the IT department because he had not yet received the requested documentation. The Board minutes indicate that a "[d]iscussion ensued regarding various emails and meetings on trying to obtain clarification on what the auditor-controller needs in order process the journal entries."

As of March 23, 2005, the date of Kucharczuk's final appearance before the grand jury, Stark had paid the IT department's outstanding bills but had still not posted the journal entries.[7]

### c. Tenth Count (Section 424(a) 7)

The tenth count of the indictment alleges that Stark violated sections 664 and 424(a) 7 by "wilfully and unlawfully attempt[ing] to withhold payment of wages to employees of the Sutter County Department of Information Technology Services."

During the same timeframe covered in count nine, the IT department was also faced with payroll obligations. Stark took the position that the IT department's payroll expenses could not be met because of its negative cash deficit. He relied on the county's deficit fund cash policy, which provides that if a

---

[7] On April 11, 2005, the Board filed a petition for writ of mandate compelling Stark to post the IT department journal entries. The writ noted that "despite a direct order of the Board of Supervisors, the Auditor has failed and refused to make the required journal entries to transfer monies into the ISF [internal service fund]."

On June 13, 2005, after Stark had been indicted by the grand jury, the superior court granted the writ and ordered Stark to post the journal entries. Stark complied, but advised the Board on June 20, 2005: "The [Auditor-Controller's Office] takes no responsibility for the completeness or accuracy of the underlying documents supporting the transactions; they were not audited nor were they auditable as presented. In our opinion, based on testimony and other information provided by the Information Technology department, these entries do not conform to generally accepted accounting principles. We believe these transactions put the County at variance with applicable state and federal law, OMB Circulars A-87 and A-133."

14

fund's deficit cannot be corrected within 30 days, the auditor-controller should notify the Board of the need for a general fund loan to the deficient fund. Stark told county treasurer Jim Stevens that on March 1, 2005, the Board had denied his request for a general fund loan. Stevens testified that stopping payroll accounts when a department is running a deficit is not part of the deficit fund cash policy. Stevens explained that certain departments, including IT, typically have a negative cash balance at certain times of the year for various reasons. Stevens noted that for the preceding three fiscal years, the IT department had run negative balances, but its bills, including payrolls expenses, had always been paid by the auditor-controller's office. Stevens also said that if pending journal entries were processed, the IT department would have a *positive* cash balance of $380,000.

On March 8, 2005, Stark told Sylvia Oakley, an accountant in his office, that "upon advice of counsel, I have no choice but to ask you to stop direct deposit payment for the IT department."[8] Oakley then temporarily stopped direct deposit of wages for these employees. On that same day, Stark sent a memo to treasurer Stevens advising that Stark anticipated needing registered warrants to cover the IT department payroll since the Board had not yet acted to resolve the IT department's cash deficit. Stevens testified that a registered warrant is not immediately payable; it is an interest-bearing promissory note in the nature of an IOU. Later that day, Stark asked Stevens to issue registered warrants for the IT department payroll. Stevens responded that he would not do so until advised by county counsel.

During the afternoon of March 8, Sutter County District Attorney Carl Adams and a senior criminal investigator from the district attorney's office went to

---

**8**     At the Board meeting on March 8, 2005, Stark informed the Board that counsel had advised him to issue registered warrants. At the same meeting, assistant county administrator Coad "clarified that Mr. Stark's counsel is independent, not from County Counsel."

Stark's office and gave him copies of certain provisions of the Penal and Labor Codes. Adams told Stark that he wanted to make certain Stark was familiar with the law regarding payment to employees. Stark replied, "It doesn't matter. They're going to get paid anyway."

On the evening of March 8, Stark sent an e-mail to all IT department employees confirming that he had cancelled direct payroll deposits and planned to issue payroll warrants. He advised that unless the Board made funds available as he had requested, he would be required to issue registered warrants. Stark also sent a memo to the treasurer, Stevens, that evening stating, "Your refusal today to comply with our lawful request has prevented these [payroll] payments to employees. If you continue your refusal of doing your duty to register the warrants, you are preventing the lawful payments of claims against the county."

At its regularly scheduled meeting that night, the Board voted to refer the matter to the state labor commissioner if Stark refused to pay the IT department employees on March 11. Stark issued paychecks and the IT department employees were paid on March 11, 2005.

### d. Eleventh Count (Section 424(a) 3)

The eleventh count of the indictment alleges that Stark violated section 424(a) 3 by knowingly keeping a false account or making a false entry in the "financial books and records for the County of Sutter for fiscal year 2003-2004."

Marilee Smith conducted an outside audit of the county's books for fiscal years 2002-2003 and 2003-2004. She explained that her certified public accounting firm begins its review of the county's financial records at the end of each fiscal year. Smith testified that eventually "we put all the financial statements together and any adjustments that we think should be posted. We come up with what we call proposed audit adjusting entries. We submit those to the county along with draft financial statements. We let the county, both the county administrator and the county auditor-controller review the proposed audit entries,

16

and look at the draft financial statements, make any comments they might have, and then we would issue our report on those financial statements."

Smith explained that if her firm finds an error or a misclassification in an account, the firm writes an adjusting journal entry to correct the account's balance. She explained that her firm issues its opinion on the county's financial statements, which includes the journal entry adjustments.

As a result of the 2002-2003 audit, Smith gave Stark a list of adjusting journal entries. Stark did not express any disagreement with the recommended adjusting journal entries.

In fiscal year 2003-2004, Smith again audited the county's books. She began her audit with the ending fund balance from the prior 2002-2003 audited financial statement. However, Smith discovered that Stark had posted some, but not all of the adjusting journal entries from the previous year's audit. Thus, the ending fund balance on the county's books differed from the balance in the prior year audit report.

### e. Twelfth Count (Section 424(a) 7)

The twelfth count of the indictment alleges that Stark violated section 424(a) 7 by "wilfully and unlawfully withhold[ing] wages earned by employees of the Sutter County Fire Safety Unit."

The county and the union representing the county's firefighters entered into an MOU in 1985, providing for eligible employees to earn overtime for all authorized work in excess of 212 hours in a 28-day work period. A later MOU, entered into in 1990, provided for the establishment of an overtime account, to be used at the discretion of the fire chief to pay firefighters for any voluntary overtime worked. No changes were made to these provisions in the subsequent MOU's that were in effect through 2005. A change in the terms of the MOU regarding benefits must be negotiated between the county and the collective bargaining group.

17

Because the firefighters regularly worked 240 hours in a 28-day work period, they automatically put in overtime hours during each work period. During the negotiation of the 1985 MOU, it was agreed that if a firefighter took sick leave or vacation in a given work period, that leave would be deducted from the appropriate leave balance, and the employee would still be paid overtime.

In December 2002, Richard Martin, a shift lieutenant with the county's fire department, noticed there was no overtime on his paycheck for the work period in which he had taken leave, and his leave balance had not been reduced. After an unsuccessful attempt to resolve the matter with Stark's office, Martin called the county's personnel director and received his overtime pay later that day.

The following month, January 2003, another issue arose when Martin learned that Stark intended to stop paying the firefighters for overtime in cash and intended to give them compensatory time off instead. According to Martin, the firefighters had been paid cash for overtime since the overtime account was established in 1990.

During the two pay periods in January 2003, the firefighters were not paid for their overtime, but received compensatory time off. After several meetings with various county personnel to discuss how firefighters should be compensated for overtime, Stark maintained his interpretation of the MOU as requiring paid leave rather than cash was correct.

On January 28, 2003, Stark sent a memo to members of the fire safety unit advising them the "incorrectly prepared payroll documents had been adjusted so that we can pay you in accordance with the MOU," meaning that firefighters would receive compensatory time off rather than cash. Referring to his interpretation of the MOU, Stark stated: "[T]he effect of following the terms of the MOU's is that when overtime is involved, your cash pay is less than it was before the erroneous interpretation and unauthorized cash payments."

Additional meetings were held on January 29 and 31, 2003. Richard Hall, the county's community services director, attended the January 31 meeting. Hall

testified that he, County Administrator Combs and county counsel explained "very clearly to Mr. Stark that [cash for overtime] is the way to read the MOU, and there was no other valid interpretation." That night, Stark issued and delivered checks for overtime payments.

Stark sent a memo to County Administrator Combs on February 12, 2003, stating that "[t]he determinative factor upon which the Auditor-Controller based his decision was Counsel's advice that since the payments had been made for 13 years it had become past practice and the county had no defendable legal position to do otherwise." Stark noted in the memo that while county counsel maintained that the applicable rules were "unambiguous" with regard to the cash payment of overtime, Stark "absolutely disagrees with this premise." Stark detailed his interpretation of the MOU. This memo was in evidence before the grand jury.

### f. Thirteenth Count (Section 424(a) 7)

The thirteenth count of the indictment alleges that Stark violated section 424(a) 7 by "wilfully and unlawfully withhold[ing] wages in the cumulative amount of $1,969.51 earned by retiring employees of the County of Sutter."

Sutter County personnel director Joann Dobelbower testified that a county rule provides that when a county employee retires on a day preceding a holiday, the employee will be paid for the holiday. She stated this rule has been in effect for more than 20 years. Ten county employees retired on December 30, 2004. Pursuant to the rule, the employees were entitled to be paid for the following day, which was the New Year's Day holiday for the county. This pay was not included in their checks. Relying on personnel records, Dobelbower compiled a chart showing a total of $1,969.51 owed to the 10 employees.

Dobelbower, after reviewing the MOU and county rules, contacted Stark, and advised him that these employees should be paid for the holiday. Stark disagreed. As of the date of Dobelbower's grand jury testimony on May 3, 2005, the 10 employees had still not been paid.

19

## 2. Analysis

As to the counts at issue, we first consider the mental state required for those crimes defined in the provisions of section 424 that refer to authorization of law or legal requirements.  Section 424(a) 1 applies to a defendant who appropriates public money to his own use or the use of another without authority of law.  Section 424(a) 6 applies when a defendant willfully fails to transfer public money, if that transfer is required by law.  Section 424(a) 7 applies when a defendant fails or refuses to disburse money, as required by a legal duty.   We separately discuss section 424(a) 3, which applies when a defendant knowingly keeps a false account or makes a false entry in an account.  Section 424(a) 3 does not refer to any legal authorization or duty in defining the conduct that it makes criminal.

The People claimed in the trial court and the Court of Appeal that section 424 requires only a general intent to do the act or make the omission, without a further mental state.  The Court of Appeal rejected this argument.  It held that a defendant must have appropriated public money, knowing that his action was unauthorized (§ 424(a) 1); willfully failed to make a transfer of money knowing the transfer is required by law (§ 424(a) 6); and willfully failed or refused to disburse money, knowing he was under a legal duty to do so.  (§ 424(a) 7.)  Here, the People now agree that a defendant must act or fail to act with knowledge of the unlawfulness of his actions, but urge that the mental state can be satisfied by either actual knowledge or criminal negligence.

Applying long-standing principles of criminal intent, we reaffirm that the violations of section 424 at issue are general intent crimes.  Further, settled authority teaches that even general intent crimes often require some kind of knowledge.  We first resolve whether the applicable provisions of section 424 require any additional mental state beyond a general intent to do the act.

20

## a. What Is the Required Mental State?

More than 80 years ago in *Dillon*, *supra*, 199 Cal. 1, this court first examined the mental state required for a violation of section 424. *Dillon* concerned unlawful purchases made by Fresno's commissioner of finance, who was also the city's purchasing agent. Purchases made for the city's benefit were granted substantial discounts. Dillon made a number of purchases for private parties using city money and receiving the discounted price. The private beneficiaries then reimbursed the city for those expenditures. Dillon was convicted of violations of section 424(a) 1 and 2. (*Dillon*, *supra*, 199 Cal. at pp. 3-4.)

Dillon argued the Legislature did not intend that section 424 should apply to the facts of his case. He asserted that he should have been prosecuted for embezzlement under section 504, which requires a specific intent to defraud. (*Dillon*, *supra*, 199 Cal. at pp. 5-6.) The *Dillon* court rejected this claim, observing that while embezzlement requires "the specific intent to appropriate [another's property] to one's self with a fraudulent intent" (*id*. at p. 11), the framers of section 424 did not intend "to incorporate or adopt, by implication or otherwise, the elements essential to constitute embezzlement as defined by section 504." (*Dillon*, at p. 9.) Rather, "the subject matter and the language of section 424 clearly indicate that the legislative mind was intently concerned with the single, specific subject of the safekeeping and protection of public moneys and the duties of public officers in charge of the same." (*Dillon*, at p. 6.) To this end, a violation of section 424 "is committed by a public officer when he uses public funds in a manner forbidden by law even though he may have no fraudulent intent when he does so. . . . It is sufficient that he intentionally committed the forbidden act." (*Dillon*, at p. 7.)

There was no question that Dillon knew he acted without lawful authority. He did not claim otherwise. Instead, he argued that even though he knew the act was unauthorized, he had no specific intent to defraud, and that the city was

21

reimbursed. The *Dillon* decision was limited to clarifying that violations of section 424(a) 1 and 2 are general intent crimes. "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456-457.)

In reaching its general intent conclusion, the *Dillon* court relied on section 20, which provides: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." The *Dillon* court stated: "The only construction that may be placed upon [section 20] is that there must be an intent to do the forbidden thing or commit the interdicted act. It furnishes no basis for the claim that there must exist in the mind of the transgressor a specific purpose or intent to violate law." (*Dillon*, *supra*, 199 Cal. at p. 7.)

The *Dillon* court had no occasion to consider what knowledge, if any, is required for a violation of the statute because the issue was not before it. In the years since *Dillon*, this court has not further addressed the mental state required for a violation of section 424. We do so now, in light of more recent jurisprudence.

Thirty years after *Dillon*, this court clarified that the "intent" referred to in section 20 means *wrongful* intent. (*People v. Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 (*Vogel*).) Vogel was charged with bigamy, and the case turned on the question of knowledge. The evidence showed Vogel married a second time without having divorced his first wife. By way of affirmative defense, Vogel wanted to introduce evidence that he had a reasonable, good faith belief that his first wife had divorced him. The trial court rejected his proffers, ruling that his good faith belief that he had been divorced was immaterial. (*Id.* at pp. 800-801.)

*Vogel* held the ruling was error.  It emphasized that the "intent" provided in section 20 is *wrongful* intent, and thus for bigamy, as in other crimes, there must be a union of act and *wrongful* intent.  (*Vogel*, *supra*, 46 Cal.2d at p. 801, fn. 2; § 20.)  Under section 26, those incapable of committing a crime include persons who commit the act " 'under an ignorance or mistake of fact, which disproves any criminal intent.' "  (*Vogel*, at p. 801, fn. 1, quoting § 26, former subd. Four (now subd. Three).)

In disapproving contrary authority, the *Vogel* court relied in part on the reasoning of the English case of *Regina v. Tolson* (1889) Law Rep. 23 Q.B.Div. 168, 181, cited in *Matter of Application of Ahart* (1916) 172 Cal. 762, 764-765, in which the English court stated:  "At common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which a prisoner is indicted an innocent act has always been held to be a good defence."

The rationale for this long-standing rule is that an act is unlawful only if done with wrongful intent.  In *Vogel*, *supra*, 46 Cal.2d 798, to act with wrongful intent required more than intentionally marrying a second time.  The commission of bigamy requires that a defendant intentionally marry, knowing he is already married to another.  It is his knowledge of that material fact that makes the intentional act of marrying wrongful.  If he lacks that knowledge, his ignorance or mistake of fact "disproves [his] criminal intent."  (§ 26, subd. Three.)

Thus, the *Vogel* court recognized that wrongful intent requires that a defendant know the material facts.  This clarification of section 20 was significant in view of the expanded creation of strict liability statutes.  The traditional rule is that some form of mens rea is required in "all but strict liability offenses."  (*People v. Hood*, *supra*, 1 Cal.3d at p. 456.)  Strict liability statutes often involve public health and safety concerns and "criminal sanctions are relied upon even if there is no wrongful intent. These offenses usually involve light penalties and no moral obloquy or damage to reputation. . . .  The offenses are not crimes in the orthodox

23

sense, and wrongful intent is not required in the interest of enforcement." (*Vogel*, *supra*, 46 Cal.2d at p. 801, fn. 2.)

In *Staples v. United States* (1994) 511 U.S. 600, the United States Supreme Court made this observation regarding strict liability offenses: "[W]e have interpreted statutes defining public welfare offenses to eliminate the requirement of *mens rea;* that is, the requirement of a 'guilty mind' with respect to an element of a crime. Under such statutes we have not required that the defendant know the facts that make his conduct fit the definition of the offense. Generally speaking, such knowledge is necessary to establish *mens rea,* as is reflected in the maxim *ignorantia facti excusat* [ignorance of facts excuses]." (*Id.* at p. 607, fn. 3.)

In recent jurisprudence, we have construed criminal statutes to include a guilty knowledge requirement even though the statutes did not expressly articulate such a requirement. (See *People v. Salas* (2006) 37 Cal.4th 967, 979.) As we shall explain, in some cases we have required actual knowledge of the material facts that demonstrate wrongful intent. In other cases, we have concluded that actual knowledge or some form of negligence in failing to know the material facts is required.

*People v. Simon* (1995) 9 Cal.4th 493 (*Simon*) involved the mental state required for a criminal violation of Corporations Code section 25401, which prohibits the offer or sale of securities by means of materially false statements or omissions. Any person who "willfully" violates that section is guilty of a felony. (Corp. Code, § 25540.) The trial court had instructed the jury that only a general intent to commit the proscribed act was required, and that the actor's intent or knowledge of a material falsehood was irrelevant. (*Simon,* at pp. 498-499.)

The *Simon* court considered a number of factors, including the nature of the conduct criminalized by Corporations Code section 25401 and the harsh penalties for its violation, to conclude the offense was not a strict liability crime. (*Simon, supra,* 9 Cal.4th at p. 521.) Generally, " '[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal

24

jurisprudence.' " (*Id*. at p. 519.) We noted the prevailing trend away from imposition of strict liability in the absence of such an express or implied intent in the statute. (*Id*. at p. 521.) Thus, although Corporations Code section 25540 does not explicitly contain a knowledge requirement, we concluded that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401." (*Simon*, *supra*, 9 Cal.4th at p. 522.)

In *People v. Coria* (1999) 21 Cal.4th 868, we held that manufacturing methamphetamine in violation of Health and Safety Code section 11379.6 requires proof that a defendant knows the character of the substance being produced. (*Coria,* at p. 872.) We observed that "[n]ot all acts of chemical synthesis are illegal; only the manufacture of specific controlled substances is prohibited." (*Coria*, *supra*, 21 Cal.4th at p. 880.) Without a knowledge requirement, the statute would criminalize " 'traditionally lawful conduct.' " (*Ibid*.) "[S]ilence with respect to a knowledge element does not mean the Legislature intended to dispense with the requirement that the accused know the character of the substance being manufactured. For crimes which impose severe punishment, '. . . the usual presumption that a defendant must know the facts that make his conduct illegal should apply.' " (*Coria,* at p. 878, quoting *Staples v. United States, supra,* 511 U.S. at p. 619.)

In *In re Jorge M.* (2000) 23 Cal.4th 866, we construed the statute outlawing possession of assault weapons (§ 12280, subd. (b)) "as requiring knowledge of, or negligence in regard to, the facts making possession criminal." (*Jorge M*., at p. 887.) We held that "the People bear the burden of proving the defendant knew or reasonably should have known the firearm possessed the characteristics bringing it within the AWCA [Assault Weapons Control Act]." (*Ibid*., italics omitted.) This interpretation was appropriate because, among other factors, a defendant convicted of the offense is subject to the severity of felony punishment.

25

Without a knowledge requirement, there would be a significant possibility that innocent possessors would fall within the statute. (*Ibid*.)

In *People v. Rubalcava* (2000) 23 Cal.4th 322, we determined that section 12020, which prohibits the carrying of a concealed dirk or dagger, does not require the specific intent to use the concealed instrument as a stabbing device. Nevertheless, "the absence of a specific intent requirement does *not* make the carrying of a concealed dirk or dagger a strict liability offense." (*Rubalcava,* at p. 331.) "Because the dirk or dagger portion of section 12020 criminalizes ' "traditionally lawful conduct," ' we construe the statute to contain a 'knowledge' element. [Citation.] Thus, to commit the offense, a defendant must still have the requisite *guilty mind*: that is, the defendant must knowingly and intentionally carry concealed upon his or her person an instrument 'that is capable of ready use as a stabbing weapon.' [Citation.] A defendant who does not know that he is carrying the weapon or that the concealed instrument may be used as a stabbing weapon is therefore not guilty of violating section 12020." (*Id*. at pp. 331-332.)

In *People v. Garcia* (2001) 25 Cal.4th 744 (*Garcia*), we held that because the offense of willful failure to register as a sex offender under section 290 involves an omission rather than an affirmative act, proof of a defendant's actual knowledge of the duty to register is required. (*Garcia,* at p. 752.) Although a jury may infer knowledge from notice, the notice alone does not necessarily satisfy the element of willfulness. (*Ibid*.)

In *People v. King* (2006) 38 Cal.4th 617, we held that to secure a conviction for possession of a short-barreled firearm (§ 12020, subd. (a)(1)), the People "must prove the possessor's knowledge of the weapon's illegal characteristics." (*King*, at p. 620.) Although the statute contains no such knowledge requirement, "[i]t is highly unlikely that the Legislature intended that a person possessing an item listed in section 12020(a)(1) for its lawful, utilitarian purpose, but unaware of the characteristic that makes possession of the item

26

illegal, would nevertheless be guilty of violating section 12020(a)(1)." (*King,* at p. 626.)

In light of the evolution of our mens rea jurisprudence, we consider the applicable provisions of section 424. We agree that this venerable statute requires a broader mental state beyond a mere intent to do the act. Section 424(a) 1 makes criminal the appropriation of public funds to oneself or another *without authority of law*. Section 424(a) 6 proscribes willfully omitting to transfer public funds *when the transfer is required by law*. Section 424(a) 7 proscribes willfully omitting or refusing to pay over money, *under any duty imposed by law*, to persons authorized to receive such money.

As the statutory language provides, it is not simply appropriation of public money, or the failure to transfer or disburse public funds, that is criminalized. Criminal liability attaches when those particular actions or omissions are contrary to laws governing the handling of public money. Unlike many statutory provisions, these provisions make the presence or absence of legal authority part of the definition of the offense. The People must prove that legal authority was present or absent.

Without a mental state as to legal authorization, a defendant could be convicted of violating the section 424 provisions by simply acting or failing to act, even if he was unaware of the facts, as defined by statute, that made his intent wrongful. Such an interpretation is inconsistent with *Vogel*, *supra*, 46 Cal.2d 798, and the common law upon which *Vogel* relied. Section 424 has never been construed as a strict liability offense. The purpose of section 424 is punishment, rather than regulation. The penalties for its violation are severe, including a prison sentence and the disqualification from public office.

The plain language of the statute and our own recent jurisprudence compel the conclusion that section 424(a) 1, 6, and 7 must be construed to include a mental element as to the presence or absence of legal authorization or obligation.

27

Our holding is not inconsistent with *Dillon*, *supra*, 199 Cal. 1.  In *Dillon*, there was no question that the defendant knew the nature of the act he was doing.  He knew he was making purchases at a discounted price for persons who did not work for the City of Fresno, and so knew "the facts that [made] his conduct fit the definition of the offense."  (*Staples v. United States*, *supra*, 511 U.S. at p. 607, fn. 3.)  Because Dillon acted with general intent to do the proscribed act while aware of the material facts, he acted with wrongful intent.  *Dillon* does not stand for the proposition that section 424 requires no knowledge of the facts or that section 424 is a strict liability crime.

As we have noted, Stark and the People disagree as to the nature of the required mental state.  Before we address that issue, we clarify what must be "known."  We use the term "knowledge" here for ease of discussion, mindful of the People's position that criminal negligence is sufficient to satisfy the mental state.

### b.  *What Must Be Known*?

In considering what must be known by a defendant in order to prove wrongful intent, the law has long distinguished between ignorance of fact and ignorance of law.  The ancient maxim, stated partially in *Staples v. United States, supra,* 511 U.S. at page 607, footnote 3, is "*ignorantia facti excusat, ignorantia juris non excusat.*"  Ignorance of facts excuses, ignorance of the law does not excuse.  " 'It is an emphatic postulate of both civil and penal law that ignorance of a law is no excuse for a violation thereof.' "  (*People v. Snyder* (1982) 32 Cal.3d 590, 592-593.)  This principle is reflected in our Penal Code:  "The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code.  It does not require any knowledge of the unlawfulness of such act or omission."  (§ 7, subd. 5.)

A defendant must know the facts that affect the material nature of his conduct, that is, the facts that must be proven to show his act is the kind of conduct proscribed by the statute.  He need not know that his behavior in light of

28

those facts is regulated by a statute. In a prosecution for bigamy, for example, the defendant must know that he is marrying and that he is already married to another. Both those material facts taken together make his action bigamy. They change the nature of his act of marrying from legitimate behavior to illegal conduct. The defendant need not know his conduct is illegal, but he must know the fact (i.e., he is already married) that affects the material nature of his conduct.

A defendant does not have to know that his conduct is a crime. "If the act itself is punishable when knowingly done, it is immaterial that the defendant thought it was lawful." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 36, p. 367.) A defendant may not escape criminal liability by asserting that he did not know the criminal law.

Section 424, however, is an unusual statute, in which the definition of some of the offenses incorporates a legal element derived from other *noncriminal* legal provisions. Each of the three provisions at issue refers to "law" or "legal duty." These references are "shorthand," used to encompass the wide variety of requirements relating to the official's duties.

The "law" applicable to the acts and omissions in these provisions of section 424 is the *authorizing* law, which is extraneous to the penal statute. Liability under section 424 arises when the officer or custodian, bound by these authorizing laws, acts without authority (§ 424(a) 1)[9] or fails to act as required. (§ 424(a) 6, 7.) For the sake of clarity, we will refer to these authorizing laws as "nonpenal laws," to distinguish them from the crimes defined in section 424. In

---

[9] As section 424(a) 1 is worded, "[r]ather than prohibiting specifically enumerated behavior, it prohibits any behavior which has not been previously approved by statute or ordinance." (*People v. Battin* (1978) 77 Cal.App.3d 635, 654.) Depending on the circumstances, it may be that no lawful authority sanctioned the defendant's actions, or that the defendant's action was expressly prohibited by particular lawful authority.

29

Stark's circumstances, for example, the nonpenal law relied on by the People includes the Government Code and the Board resolutions.

As we have explained, presence or absence of legal authorization is an essential element of each of the offenses at issue. It also a "fact" about which the defendant must have knowledge in order to act with wrongful intent. Thus, the People must prove, as a matter of fact, *both* that legal authority was present or absent, *and* that the defendant knew of its presence or absence.

The People do not have to prove that defendant knew chapter and verse of the nonpenal law. It is sufficient that the defendant knew generally that a nonpenal law required or prohibited his conduct. As with any mental state, the People may prove this knowledge by reference to the facts and circumstances of the case.

### c. What Is the Required Scienter?

We stated in *People v. Salas*, *supra*, 37 Cal.4th 967, 975, "Depending upon the crime, a requirement of guilty knowledge may mean that defendants are innocent unless they know the facts making their conduct criminal."[10] In other cases, however, "it is sufficient that the defendants either know those facts *or* were criminally negligent in failing to know them." (*Salas,* at p. 975.)[11]

Stark maintains that the prosecution must prove a defendant's actual knowledge of the legal requirements underlying the section 424(a) 1, 6, and 7 charges. The People argue that it is sufficient for the prosecution to prove that a

---

[10]     We repeat that a defendant does not have to know that his conduct is a crime. He must know the facts that affect the material nature of his conduct.

[11]     Additionally, as noted, we held in *In re Jorge M.*, *supra*, 23 Cal.4th 866, 867 that commission of the offense requires proof that a defendant knew or reasonably should have known of the firearm's characteristics as an assault weapon. We acknowledged that a "reasonably should have known" formulation "departs somewhat from the usual description of criminal negligence." (*Id.* at p. 887 & fn. 11.)

defendant knew, or was criminally negligent in failing to know, those legal requirements.

As the People note, we determined in *Simon*, *supra*, 9 Cal.4th 493, that actual knowledge of the facts or criminal negligence in failing to discover the facts was the appropriate scienter. As we have previously explained, *Simon* concerned Corporations Code section 25401, which prohibits the sale or purchase of securities by means of misleading statements or omission of material facts. A criminal penalty is imposed for "willfully" violating Corporations Code section 25401. (Corp. Code, § 25540.) After concluding that section 25401 is not a strict liability crime, we construed the statute to require a mental element. We held that a criminal violation of Corporations Code 25401 requires "either (1) knowledge of the false or misleading nature of a representation or of the materiality of an omission, *or (2) criminal negligence in failing to acquire such knowledge.*" (*Simon,* at p. 497, italics added.) *Simon* derived the particular mental state of actual knowledge or criminal negligence from the corresponding civil remedy for a violation of Corporations Code section 25401, which states that there is no liability if the defendant " 'exercised reasonable care and did not know (or if he had exercised reasonable care would not have known)' of the false or misleading nature of a statement or omission . . . ." (*Simon*, at p. 517.)

*Simon* relied on related statutory authority to formulate the mental state required for a criminal violation of Corporations Code section 25401. While similar related statutes do not apply to section 424, *Simon* remains instructive. It recognizes that, in particular circumstances, actual knowledge *or* criminal negligence in failing to know material facts is the appropriate scienter.

We agree with the People that those circumstances are present here. Strong public policy supports a rule requiring either actual knowledge or criminal negligence in failing to know the legal requirements underlying the section 424 charges. "Criminal negligence refers to ' "a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must

31

be aggravated, culpable, gross, or reckless." ' (*People v. Penny* (1955) 44 Cal.2d 861, 879; see *People v. Valdez* (2002) 27 Cal.4th 778, 783; *People v. Peabody* (1975) 46 Cal.App.3d 43, 47; CALJIC No. 3.36.)" (*People v. Salas*, *supra,* 37 Cal.4th at p. 971, fn. 2.)

The *Dillon* court stated: "The safekeeping of public moneys has, from the first, been safeguarded and hedged in by legislation most strict and severe in its exactitudes. It has continuously been the policy of the law that the custodians of public moneys or funds should hold and keep them inviolate and use or disburse them only in strict compliance with the law." (*Dillon*, *supra*, 199 Cal. at p. 12.) "The wisdom of the legislature in requiring custodians of public moneys to hold them inviolate is both a protection to the public and to the officer as it tends to remove from him the temptations that beset those who have large sums of money in their possession free from immediate demands." (*Id*. at p. 15.)

Citing authority that included Penal Code section 424 and *Dillon*, *supra*, 199 Cal. 1, we observed in *Stanson v. Mott* (1976) 17 Cal.3d 206, 225, that those public officers "who either retain custody of public funds or are authorized to direct the expenditure of such funds bear a peculiar and very grave public responsibility, and . . . courts and legislatures, mindful of the need to protect the public treasury, have traditionally imposed stringent standards upon such officials."

A mental state limited solely to actual knowledge is too rigid a formulation in light of the purpose of section 424. The statute applies to public officers and others charged with "the receipt, safekeeping, transfer, or disbursement" of public funds. (§ 424(a).) Because the Legislature intended that such persons fulfill their obligations "in strict compliance with the law" (*Dillon*, *supra*, 199 Cal. at p. 12), we expect them to be aware of and indeed embrace the duties the law imposes upon them. It would be antithetical to the intent of the Legislature that those entrusted with control of public funds could evade an actual knowledge requirement by failing to conduct the research that would inform them of their

32

duties, or by failing to seek the advice of persons who could provide that information.  Limiting the requirement to actual knowledge would operate to shield those whose efforts at determining their duties does not comport with the significant public responsibility these individuals bear.

Given that "[t]he safekeeping of public moneys has, from the first, been safeguarded and hedged in by legislation most strict and severe in its exactitudes" (*Dillon*, *supra*, 199 Cal. at p. 12), a strict actual knowledge standard would impair effective enforcement.  It would defy the exacting nature of the statute if one could escape criminal liability by claiming lack of subjective knowledge in circumstances that are objectively unreasonable.  Consequently, we agree with the People that we should construe the applicable subdivisions of section 424 to require actual knowledge *or* criminal negligence.

A criminal negligence standard protects both the public and the accused.  If public officials and others entrusted with control of public funds subjectively believe their actions or omissions are authorized by law, they are protected from criminal liability unless that belief is objectively unreasonable, i.e., is the product of criminal negligence in ascertaining legal obligations.  Public officials and others should not be criminally liable for a reasonable, good faith mistake regarding their legal responsibilities.  Nor is section 424 intended to criminalize ordinary negligence or good faith errors in judgment.

Section 424 is not limited to public officers.  "Because of the essential public interest served by [section 424] it has been construed very broadly." (*People v. Groat* (1993) 19 Cal.App.4th 1228, 1232.)  It applies to "every other person" with some control over public funds.  (See *People v. Groat*, at p. 1234 [manager in city's public safety department who had authority to certify her own time record was a person charged with disbursement of public funds]; *People v. Evans* (1980) 112 Cal.App.3d 607 [county aid worker with authority to complete emergency check requisitions for clients was a person charged with disbursement of public money].)  Thus, while the criminal negligence standard remains the

33

same, its application will necessarily be measured by what is objectively reasonable for the particular person in the defendant's position.

Stark insists that actual knowledge is required. At oral argument, his counsel asserted that a defendant charged under the statute "cannot willfully act without authority of law if he does not have knowledge of what the law requires him to do."[12] However, the authority relied on by Stark is distinguishable.

In *People v. Hagen* (1998) 19 Cal.4th 652 (*Hagen*), we construed the term "willfully" in Revenue and Taxation Code former section 19405, subdivision (a)(1), which made it a felony to "[w]illfully make[] and subscribe[] any [tax] return . . . that he or she does not believe to be true and correct as to every material matter." (Rev. & Tax. Code, former § 19405, as amended by Stats. 1993, ch. 826, § 6, pp. 4462–4463, repealed by Stats.1994, ch. 1243, § 58; see now Rev. & Tax. Code § 19705.) We observed that the term "willfully" has been interpreted in a number of statutory contexts as requiring more than mere volition in committing the prohibited act. (*Hagen*, at p. 663.) We concluded the term "willfulness," as an element of this particular tax statute, "requires the prosecution to prove the defendant made the perjurious statement in voluntary, intentional violation of a known legal duty." (*Id*. at p. 666.) This construction is consistent with the United States Supreme Court's definition of willfulness in federal criminal tax statutes, including one "substantially identical" to the statute at issue in *Hagen*. (*Hagen*, *supra*, at pp. 658-661, 664.)

Additionally, as observed in *Hagen*: "[T]he filing of a California personal income tax return is an act demanded by law of most California residents. By virtue of this and other reporting requirements, millions of Californians are subject to, and must attempt to conform to, a myriad of state laws and regulations (in addition to the many federal laws incorporated into state law). Most taxpayers

---

[12] The term "willfully" is used in section 424(a) 6 and 7, not in section 424(a) 1.

34

cannot be expected to have *special expertise* in the area of tax law, and that many taxpayers, without intending to disobey the law, will occasionally err out of ignorance or a good faith misunderstanding of the law's requirements is inevitable. California law, like its federal model, provides a graduated scheme of civil penalties and misdemeanor and felony punishment to deter both honest mistakes and willful fraud. . . . [W]e think it likely the Legislature . . . intended to use these graduated penalties to 'separate the purposeful tax violator from the well-meaning, but easily confused, mass of taxpayers.' " (*Hagen*, *supra*, 19 Cal.4th at p. 662, italics added.)

Because our decision in *Hagen*, *supra*, 19 Cal.4th 652, concerned the interpretation of "willfulness" in a criminal tax offense, it does not assist us here. In *Cheek v. United States* (1991) 498 U.S. 192, 200 the United States Supreme Court stated, "special treatment of criminal tax offenses is largely due to the complexity of the tax laws." The high court observed that "the proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws." (*Id*. at pp. 199-200.) Thus, a defendant's good faith belief that he is not violating the tax law negates the statutory "willfulness" requirement, whether or not the defendant's good faith belief is objectively reasonable. (*Id*. at p. 202.)

However, public policy concerns for the average taxpayer, who is not expected to have a "special expertise" in tax law (*Hagen*, *supra*, 19 Cal.4th at p. 662), do not apply with equal force to those public officers and others entrusted with the safekeeping of public money. The filing of tax returns is an obligation imposed by the government. Because that obligation entails the application of myriad and complex statutes, an actual knowledge requirement serves to protect the innocent, misinformed taxpayer.

By contrast, those charged with control of public funds freely elect to hold their positions of public trust. In this sense, those persons who fall within the purview of section 424 are more comparable to the sellers of securities in *Simon*,

35

*supra*, 9 Cal.4th 493, than to taxpayers who do not voluntarily assume that obligation.  Although some violations of section 424 may arise under complex public finance laws, as Stark asserts, certainly not all do.  But even in complex situations, public officials and others are nevertheless obligated to act "in strict compliance with the law." (*Dillon*, *supra*, 199 Cal. at p. 12.)  They are expected to take reasonable necessary steps to determine the appropriateness of their conduct.

*Garcia*, *supra*, 25 Cal.4th 744, likewise does not mandate an element of actual knowledge.  We noted in *Garcia* that the willful failure to register as a sex offender under section 290 involves "a *failure* to act." (*Garcia*, at p. 752.)  "The word 'willfully' implies a 'purpose or willingness' to make the omission.  (§ 7.)  Logically one cannot purposefully fail to perform an act without knowing what act is required to be performed.  As stated in *People v. Honig* (1996) 48 Cal.App.4th 289, 334, 'the term "willfully" . . . imports a requirement that "the person knows what he is doing." [Citation.]  Consistent with that requirement, and in appropriate cases, knowledge has been held to be a concomitant of willfulness. [Fn. omitted.]'  Accordingly, a violation of section 290 requires actual knowledge of the duty to register.  A jury many infer knowledge from notice, but notice alone does not necessarily satisfy the willfulness requirement." (*Garcia*, *supra*, at p. 752.)

Registration is an obligation imposed on a sex offender due to his criminal conduct.  Like the paying of taxes, it is not an obligation he seeks out.  However, a public officer or any other person charged with the transfer or disbursement of public money is not in the same position as the sex offender required to register under section 290.  While section 424(a) 6 and 7 criminalizes "willful" failures to act, public officers and others entrusted with safekeeping of public funds have voluntarily assumed the duties that require their action.  They seek out and accept these obligations.  They must be aware that the government positions they accept come with legal obligations.  Because those who transfer and disburse public money bear significant public responsibility, they may be held to a standard of

36

criminal negligence.  Stated another way, those who willfully accept the responsibility to manage or handle public money cannot remain recklessly ignorant of the nonpenal law regulating their actions.  Rather, "duty requires the person to acquaint himself with the facts."  (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 668.)

Finally, Stark opposes a criminal negligence standard because he urges there is a civil remedy against those public officials who make unauthorized expenditures by acting without due care.  He relies on *Stanson v. Mott*, *supra*, 17 Cal.3d 206, in which we held that a public official who, in good faith, authorizes the improper expenditure of public funds may be personally liable to repay such funds.  We stated that "public officials must use 'due care,' i.e., reasonable diligence, in authorizing the expenditure of public funds, and may be subject to personal liability . . .  in the absence of such due care."  (*Id*. at pp. 226-227.)  But the availability of a civil remedy against public officials for unauthorized expenditures does not deprive the Legislature of authority to impose criminal sanctions as well.

Stark argues that the conduct underlying the charges here is better resolved in a civil forum.  It is not for this court to question the wisdom of the Sutter County District Attorney's Office in employing section 424 to address Stark's conduct as county auditor-controller.  The Legislature enacted a statute that imposes criminal liability for the acts and omissions it describes.  It is for the prosecution to decide whether to bring charges and for a jury to decide if those charges can be proven.

*3.  Section 424(a) 3*

We address separately the mental state required for a violation of section 424(a) 3, which applies to a defendant who "[k]nowingly keeps any false account . . . ."  Unlike the provisions of section 424 discussed above, section 424(a) 3 does not mention any "authority of law."  The offense expressly requires that a defendant act "knowingly."  The word "knowingly" is defined in section 7

37

as follows: "5. The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission." (§ 7, subd. 5.) Thus, under this definition, a person violates section 424(a) 3 if he or she keeps an account with knowledge that the account is false.

### B. Section 424 — Instructional Error on Mental State

With regard to the alleged violations of Penal Code section 424, the grand jury was instructed as follows: "In the crimes charged in the indictment . . . , there must exist a union or a joint operation of act or conduct and general criminal intent. [¶] General criminal intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he or she is acting with general criminal intent, even though he or she may not know that his or her act is unlawful."

The prosecutor then defined the terms "knowingly" and "willfully" and read section 424 verbatim.

Later, the prosecutor told the grand jury: "What we have here are general intent crimes. You don't have to intend to break the law. You don't have to intend to do anything that's illegal. All you have to do is the act that the law says is a crime. You've heard the phrase ignorance of the law is no excuse. That's what you're dealing with with a general intent crime, especially misappropriation of public money."

However, as we have discussed, the section 424 provisions at issue require that the defendant knew or was criminally negligent in failing to know that his actions and omissions were without lawful authority or contrary to legal requirements. The grand jury was not given such an instruction.

The People and Stark disagree as to how Stark may challenge the indictment on the ground of instructional error. Stark, relying on *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018 (*Cummiskey*), claims that he may assert his claim of instructional error under section 995, subdivision (a)(1)(B), which

38

provides for dismissal of the indictment when "the defendant has been indicted without reasonable or probable cause." The People argue that Stark must demonstrate that the instructional error resulted in a denial of due process in the grand jury proceedings (see *People v. Backus* (1979) 23 Cal.3d 360, 392-393 (*Backus*)), and that such a claim must be brought as a nonstatutory motion. For the reasons explained below, we hold that instructional error on the mental state required for an offense can be challenged under a section 995, subdivision (a)(1)(B) motion. An improper instruction on the required mental state raises the possibility that the defendant may have been indicted on less than probable cause.

In *Cummiskey*, *supra*, 3 Cal.4th 1018, the petitioner's principal claim was that the grand jury had been misled on the standard of proof for returning an indictment. The superior court denied the motion to set aside the grand jury indictment under section 995, and this court granted review after a summary denial of Cummiskey's petition for writ of mandate.

The grand jury in *Cummiskey* was instructed that an indictment could be returned if all the evidence, taken together, provided sufficient cause to believe that an offense had been committed and that the accused was guilty of it. (*Cummiskey*, *supra*, 3 Cal.4th at p. 1025.) Cummiskey argued that the "sufficient cause" test, while applicable to a magistrate conducting a preliminary hearing, is inadequate for a grand jury proceeding. Instead, Cummiskey claimed the grand jury should have been instructed with the exact language of section 939.8, which she asserted required a higher standard of proof.[13] Cummiskey argued that the failure to instruct the grand jury with the precise language of section 939.8 was grounds for dismissal of the indictment under section 995. (*Cummiskey*, at pp. 1025-1026.)

---

[13] Section 939.8 provides: "The grand jury shall find an indictment when all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, warrant a conviction by a trial jury."

We rejected Cummiskey's claim, holding that the standard of proof for returning an indictment under section 939.8 is " 'probable cause.' " (*Cummiskey*, *supra*, 3 Cal.4th at p. 1029.) Thus, the grand jury was adequately instructed when told that it must find the equivalent of " 'probable cause to indict.' " (*Ibid*.)[14]

Justice Kennard, in a concurring and dissenting opinion joined by Justice Mosk, described Cummiskey's claims as challenges to the propriety of legal advice and instructions given to the grand jury and, as such, were not cognizable under section 995 as a basis for setting aside the indictment. (*Cummiskey*, *supra*, 3 Cal.4th at pp. 1039-1040 & conc. & dis. opn. of Kennard, J.) Justice Kennard stated that the only recognized exception to these statutory grounds permits a court to "set aside an indictment on the ground that the proceedings have failed to comport with the demands of the due process clause of the federal or state Constitution." (*Id.* at p. 1039.)

In a footnote, the *Cummiskey* majority responded: "Petitioner's chief assertion—that the grand jury was misinstructed on the minimum standard of proof required to indict—is manifestly tantamount to a claim that, as instructed, the jury may have indicted her on less than reasonable or probable cause. As such, the indictment was plainly subject to a motion to set it aside on that ground under section 995, subdivision (a)(1)(B)." (*Cummiskey*, *supra*, 3 Cal.4th at p. 1022, fn. 1.)

Stark argues that the prosecutor's failure to instruct the grand jury on the required mental element of section 424 is likewise "tantamount to a claim that, as

---

**14** Additionally, Cummiskey claimed the prosecutor, by instructing the grand jury that it " 'should only consider the evidence presented,' " and by refusing to answer certain evidentiary questions, misled it regarding the exercise of its independent investigative authority under section 939.7. (*Cummiskey*, *supra*, 3 Cal.4th at p. 1030.) Cummiskey also argued that the prosecutor failed to instruct the grand jury on lesser included offenses. (*Id*. at p. 1034.) We rejected both these claims as well. (*Id*. at pp. 1034, 1036.)

instructed, the jury may have indicted [him] on less than reasonable or probable cause." (*Cummiskey*, *supra*, 3 Cal.4th at p. 1022, fn. 1.)  The People, on the other hand, argue that the *Cummiskey* majority held only that a misinstruction on the standard of proof required to indict was cognizable under section 995.  The People rely on *People v. Gordon* (1975) 47 Cal.App.3d 465, in which the Court of Appeal concluded that an indictment cannot be challenged under section 995 "on the grounds that the grand jury was given insufficient or even inaccurate legal advice before returning an indictment.  [¶]  The legal sufficiency of the evidence which underpins an indictment is reviewed by a judge of the superior court at the time of the hearing on a motion under section 995 of the Penal Code.  It is this check on the grand jury's power to indict that serves to protect a defendant against unmeritorious or legally incorrect indictments." (*Gordon,* at p. 476.)

The People read our footnote in *Cummiskey* too narrowly.  The role of the grand jury in an indictment proceeding is to "determine whether probable cause exists to accuse a defendant of a particular crime." (*Cummiskey*, at p. 1026.)  Probable cause " ' "means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*Cummiskey*, *supra*, 3 Cal.4th at p. 1029, italics omitted, quoting *Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 56.)  The grand jury serves as the functional equivalent of a magistrate who presides over a preliminary examination on a felony complaint.  "Like the magistrate, the grand jury must determine whether sufficient evidence has been presented to support holding a defendant to answer on a criminal complaint." (*Cummiskey,* at p. 1027.)

We have explained the limited role of the reviewing court with regard to a grand jury indictment:  "The duty of determining whether or not an indictment should be found is lodged exclusively in the grand jury and not in the courts." (*Lorenson v. Superior Court, supra,* 35 Cal.2d  at p. 55.)  The reviewing court does not substitute its judgment as to the weight of the evidence for that of the

grand jury, and must draw all reasonable inferences in favor of the indictment. (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1148.)

While the evidence presented to the grand jury need not be sufficient to support a conviction beyond a reasonable doubt, there must be *some* factual showing as to each element of the crime. Such a showing may be made by circumstantial evidence supportive of reasonable inferences. (See *Williams v. Superior Court, supra,* 71 Cal.2d at p. 1148.) Among the elements, of course, is the mental state required to commit the offense.

A grand jury need not be instructed with the same degree of precision that is required for instructing the trial jury. (See *Cummiskey*, *supra*, 3 Cal.4th at p. 1034.) But when a grand jury is not asked to consider the mental state required for the commission of the offense, absence of any instruction on that topic raises the possibilty that the defendant may have been indicted on less than reasonable or probable cause. The indictment is subject to a motion to set it aside on that ground under section 995, subdivision (a)(1)(B).[15]

Stark asserts that the prosecutor's failure to instruct on the knowledge requirement for section 424 "*is* a misinstruction on the standard of proof . . . . which effectively removed the element of mens rea from any independent assessment by grand jurors . . . ." His argument fails because of the particular state of this record. As we shall explain, based on parallel counts of the accusation under Government Code section 3060, the record demonstrates that the grand jury did indeed consider whether Stark acted or failed to act with actual knowledge. Thus, the failure to instruct with the guilty knowledge requirement set out in this opinion was harmless.

---

[15] Accordingly, we disapprove of *People v. Gordon, supra,* 47 Cal.App.3d 465, to the extent it is inconsistent with our holding here.

The identical conduct that was the basis for the counts of the criminal indictment is also the basis of parallel counts in the accusation. In particular:

1) Count three of the accusation is based on the same conduct as the third count of the indictment: Stark's unauthorized transfer of money from the county's general fund to the Waterworks District. Both counts allege that Stark's conduct violated section 424(a) 1;

2) Count six of the accusation is based on the same conduct as the ninth count of the indictment: Stark's refusal to post the journal entries for the IT department. Both counts allege that Stark's conduct violated section 424(a) 6;

3) Counts seven and eight of the accusation are based on the same conduct as the tenth count of the indictment: Stark's attempt to withhold wages from employees of the IT department. Count eight of the accusation and count ten of the indictment allege that Stark's conduct was an attempted violation of section 424(a) 7;

4) Counts eleven and twelve of the accusation are based on the same conduct as the twelfth count of the indictment: Stark's refusal to pay overtime to the fire department employees in January 2005. Both count twelve of the accusation and count twelve of the indictment allege that Stark's conduct violated section 424 (a) 7; and

5) Counts fourteen and fifteen of the accusation are based on the same conduct as the thirteenth count of the indictment: Stark's withholding of wages for the New Year's holiday from retiring employees. Both count fifteen of the accusation and count thirteen of the indictment allege that Stark's conduct violated section 424(a) 7.

Turning first to the counts of the accusation listed above, violations of the Government Code and other laws are alleged, as are the parallel violations of section 424. As before, we will refer to these other laws as "nonpenal laws" to distinguish them from section 424. The district attorney told the grand jury, "All the Government Code statutes that give the auditor the duty to do certain things or

43

the Board to do certain things are contained in the accusation, and then we also included the parallel violations of [penal] law." Specifically, count three of the accusation alleges that Stark's transfer of county funds to the Waterworks District violated Government Code sections concerning the authority of the Board to make changes to the adopted budget and to approve approriations from reserve accounts,[16] *and* section 424(a) 1, which criminalizes the appropriation of money without lawful authority.

Count six of the accusation alleges that Stark's failure to post entries for the IT department violated a Government Code section requiring the auditor-controller to issue warrants on claims the Board has ordered paid,[17] *and* section 424(a) 6, which criminalizes the willful failure to transfer money as legally required.

Count seven of the accusation alleges that Stark's attempt to withhold wages from IT department employees was an attempted violation of Labor Code section 222, *and* count eight of the accusation alleges that the identical conduct was an attempted violation of section 424(a) 7, which criminalizes the willful failure to pay over money when under a legal duty to do so.

Count eleven of the accusation alleges that Stark's failure to pay wages to fire department employees violated the Fair Labor Standards Act and Labor Code section 222, *and* count twelve of the accusation alleges that the identical conduct violated section 424(a) 7.

Count fourteen of the accusation alleges that Stark's withholding of wages to retiring employees for the New Year's holiday violated Sutter County rule 13.10, concerning holiday pay for terminating employees, and Labor Code section 222, *and* count fifteen of the accusation alleges that the identical conduct violated section 424(a) 7.

---

[16] Government Code sections 29088 and 29130.
[17] Government Code section 28903.

As will be discussed regarding Government Code section 3060, the grand jury was instructed that Stark had to *know* "the act he . . . was performing or failing to perform *was required or prohibited by law*," and "the law may be set forth in a statute, ordinance or other provision of law." (Italics added.) In returning the counts of the accusation, the grand jury necessarily found sufficient evidence that Stark knew the act he performed or failed to perform was required or prohibited by the nonpenal law specified in those counts. This finding of knowledge extends to the parallel violations of section 424 in the accusation, which rest on the same nonpenal law.[18]

In turn, as listed above, the same violations of section 424 alleged in the accusation are alleged in parallel counts of the indictment. The prosecutor argued to the grand jury that "[t]he evidence will be viewed the same as it supports returning the indictment and the accusation against Robert Stark." Thus, as to the parallel violations of section 424 in the indictment, the failure to instruct with the guilty knowledge requirement was harmless.

Finally, there was no instructional error as count eleven of the indictment, which alleges a violation of section 424(a) 3. As we have explained, section 424(a) 3 requires only that the act be done knowingly. The grand jury here was properly advised: "The word 'knowingly' means with knowledge of the existence of the facts in question. [¶] Knowledge of the unlawfulness of an act or omission is not required."

### C. Government Code Section 3060 — Mental State

In his petition, Stark sought review of the mental state required for willful misconduct under Government Code section 3060. We need not decide that issue to resolve the gravamen of Stark's challenge to the accusation. Stark's ultimate

---

[18]    In view of our conclusion that the required mental state for these section 424 provisions is actual knowledge or criminal negligence, the grand jury instruction was more generous to Stark than required.

argument is quite different from that point in his petition for review. Unlike his claim regarding section 424, Stark does not argue that the grand jury was improperly instructed on the Government Code section 3060 mental state. Instead, he asserts that some of the district attorney's argument and accompanying PowerPoint slides may have confused the grand jury and "vitiated" the correct instruction. Thus, he urges the accusation must be set aside. As we shall explain, this argument fails.[19]

*1. Background*

Government Code section 3060 et seq. provides for a special statutory proceeding authorizing the removal from office of "any officer of a district, county, or city" for "willful or corrupt misconduct in office." (Gov. Code, § 3060; see 2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Governmental Authority, § 109, p. 1201.)

A proceeding under Government Code section 3060 begins with a grand jury's presentation of an accusation against the official charged with misconduct. (Gov. Code, § 3060.)[20] The official may object to the legal sufficiency of the accusation, and if the objection is rejected, the official "shall answer thereto." (Gov. Code, § 3068; see *id*., § 3066.) If the official denies the charges, the accusation shall be tried by a jury "and conducted in all respects in the same

---

[19] The People argue that Government Code section 3066 does not provide a basis for challenging an accusation based on an allegedly erroneous grand jury instruction. The statute allows an official who is the subject of the accusation to object to its "legal sufficiency."

We need not resolve that question here because, even assuming the statute permits a challenge for instructional error, Stark's argument is without merit.

[20] Government Code section 3060 provides in relevant part: "An accusation in writing against any officer of a . . . county, . . . for willful or corrupt misconduct in office, may be presented by the grand jury of the county for or in which the officer accused is elected or appointed. An accusation may not be presented without the concurrence of at least 12 grand jurors, or at least eight grand jurors in a county in which the required number of members of the grand jury is 11."

---

manner as the trial of an indictment." (Gov. Code, § 3070; see id., § 3069.) Upon conviction, the court "shall pronounce judgment that the defendant be removed from office." (Gov. Code, § 3072.)

"This special statutory proceeding is not a criminal prosecution; i.e., its object is not to convict the defendant of a crime but merely to remove him or her from office, no other punishment being authorized." (2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Governmental Authority, § 109, p. 1201.) A crime committed in a defendant's official capacity necessarily suffices to establish "willful or corrupt misconduct in office" under Government Code section 3060. (See *People v. Hale* (1965) 232 Cal.App.2d 112, 122; *People v. Harby* (1942) 51 Cal.App.2d 759, 767.) However, acts which can be punished under Government Code section 3060 are broader than behavior subject to criminal charges. In *Coffey v. Superior Court* (1905) 147 Cal. 525 (*Coffey*), we stated that " 'misconduct in office' is broad enough to include any willful malfeasance, misfeasance, or nonfeasance in office," even without any " 'criminal intention.' " (*Id*. at p. 529.)

A 13-count accusation remains against Stark. Nine counts are based on the same conduct alleged in the criminal indictment. Four additional counts of the accusation allege the following conduct: in count one, that Stark failed to file the budget on time as required by the Government Code provision and Board resolution; in counts four and five, that Stark "unilaterally amend[ed]" the 2004-2005 county budget, and "creat[ed] unauthorized reserve accounts" in that budget in violation of Government Code provisions and a Board resolution;[21] and in

---

[21]    Counts four and five of the accusation were parallel to particular counts in the indictment. However, those counts of the indictment were dismissed by the Court of Appeal because the alleged acts by Stark did not constitute "use" within the meaning of section 424(a) 2, which applies to one who "[l]oans [public money] or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law[.]"

count nine, that Stark removed IT department employees "from receipt of wages by direct deposit."

2. *Instruction and Argument*

The prosecutor instructed the grand jury as follows:

"Misconduct in office includes any knowing and willful malfeasance, misfeasance or nonfeasance.

"Malfeasance is the knowing and willful doing of an act that is unlawful.

"Misfeasance is the knowing and willful failure to perform a duty in the manner that the law requires.

"Nonfeasance is the knowing and willful failure to act when the law requires an act. ¶

"*Mere negligence or mistake in judgment in the performance of a public officer's duty does not constitute willful misconduct in office.*

"*It must be proved that the public officer knew the act that he or she was performing or failing to perform was required or prohibited by law, and, having said knowledge, willfully failed to act, in whole or in part, in conformity with such law.*

"The law may be set forth in a statute, ordinance or other provision of law.

"The Auditor-Controller is a public officer or public official." (Italics added.)

The grand jury was instructed in great detail on the manner of its deliberations, and the particular Government Code sections and rules applicable to the accusation and indictment. The grand jury was advised that a written set of the instructions would be provided for its deliberations.

There was a distinct break between the legal instructions and the prosecutors' argument. At the conclusion of the instructions, District Attorney Adams said that he would next argue the significance of the evidence: "You have now heard all of the law and received all the evidence that your decision will be based on. [¶] We are going to take a very brief break and then we are going to

48

present our opinion of the case, and it is simply a lawyer's opinion. [¶] I even want to go so far as to caution you at this point that we're not really speaking as the Grand Jury's advisors. We are here to present to you what we believe, as attorneys, is the outline of the case and the significance of the evidence to suggest to you what you should do with it. [¶] We are advocates, and we are advocates for one side of the case, where the other side will not be heard." Following argument presented by the deputy district attorney, Adams told the grand jury: "What you do depends on the facts that you have determined through all the testimony and all of the exhibits *and on the law that was read to you earlier.*" (Italics added.)

The instruction at issue here regarding knowledge of law concerns the nonpenal law that requires or prohibits the act or omission. As we have previously explained, the mental state for a violation of section 424 may be satisfied by actual knowledge *or* criminal negligence in failing to know the legal requirements governing the charged acts or omissions. In this case, we need not decide the precise contours of the mental state required by Government Code section 3060. Our analysis here is based on the narrow confines of this record. This grand jury was instructed that a public officer must have actual knowledge of the legal requirement or prohibition pertaining to his act. As noted in the analysis of the criminal charges, the grand jury could not have returned the accusation against Stark without determining that he had actual knowledge of the law.

We now turn to Stark's allegation of juror confusion. Rather than attack the instructions themselves, Stark claims that some of the prosecutor's comments during argument and accompanying PowerPoint slides "vitiated" that instruction on actual knowledge.

Stark objects first to the italicized sentence in this portion of the prosecutor's argument: "Misconduct in office involves any willful malfeasance, misfeasance or nonfeasance in office, and 'willfully' means done purposefully. *It*

*doesn't mean that you have intended to break the law.* You just have to commit the act that the law says is either a violation of a statute or criminal act also."

Stark does not explain his objection to the italicized phrase, nor do we discern one. The prosecutor merely repeated the standard from *Coffey*, *supra*, 147 Cal. at p. 529, and properly pointed out that the act or omission must be done willfully. The correct statement that an intent to break the law is not required in no way undermines the instruction that an official "know" the act in question was required or prohibited by law.[22]

Stark next objects to the explanation of malfeasance. The PowerPoint slide defined "malfeasance" as follows: "The commission of an illegal act — an act that ought not be done at all. [¶] *Includes such acts as amount to a breach of good faith and right action that are impliedly required of all public officers.* [¶] Example: performing an act in violation of a statute. [¶] Does not have to be a violation of a criminal law." (Italics added.)

Again, Stark does not explain his objection. And again, the italicized sentence does not concern "knowledge" of the law. The sentence describes the nature of the *act* required. Assuming Stark's objection is that the sentence is too broad, its scope was narrowed by the example given: violation of a statute.

Stark next objects to the PowerPoint slide entitled "Nonfeasance." The slide described nonfeasance as follows: "Knowing and willful failure to act when the law requires an act. [¶] Neglect of the duties of office. [¶] Failure to act where the duty to act is premised on something the official should have known. [¶] Something more than oversight or neglect is required to constitute willful misconduct."

The first two sentences are a correct explanation of nonfeasance: failure to do what the law requires and a failure to perform the duties of office. The third

---

[22] As pointed out, we need not and do not decide here what mental state is required to establish willful misconduct under Government Code section 3060.

sentence, referring to something the official "should have known" may imply a standard less than actual knowledge. However, the very next sentence points out that mere oversight or neglect is insufficient. Starks concedes this latter statement is correct. Considering the entire statement set out in the slide in light of the clear statement in the instructions that actual knowledge is required, this single sentence used in argument does not raise a legitimate concern that the grand jury was misled as to the mental state required in order to return an accusation, or that it returned the accusation on legally insufficient evidence.

### D. Conflict of Interest as a Basis to Set Aside the Indictment and Accusation

#### 1. *Background*

After the grand jury investigation had begun, Stark's attorney asked District Attorney Adams to declare a conflict of interest. Adams declined. While grand jury proceedings were ongoing, Stark tried to file a motion to disqualify the Sutter County District Attorney's Office. The filing was disallowed, however, because no action was pending. The grand jury returned its indictment and accusation on May 4, 2005.

In June 2005, Stark moved to disqualify the district attorney's office from prosecuting the indictment and accusation against him. Relying on section 1424 and due process grounds, Stark argued that as auditor-controller he would continue to make decisions affecting the daily operation of the district attorney's office; the district attorney's office is financially impacted by Stark's alleged misconduct; and District Attorney Adams was personally involved in events that related to the grand jury investigation.

While the motion to disqualify was pending, Stark filed his motion to set aside the indictment and accusation, arguing that the district attorney's office suffered from an apparent conflict of interest during the grand jury proceedings. Stark incorporated the facts and argument from his disqualification motion, but claimed the standard of *People v. Superior Court* (*Greer*) (1977) 19 Cal.3d 255

51

(*Greer*), governs the determination of whether a conflict of interest requires the setting aside of the indictment and accusation.

Starks's motion to disqualify the district attorney's office was heard first and denied. Two months later, the trial court denied Stark's motion to set aside the indictment and accusation. The trial court, applying the standard in *Greer*, *supra*, 19 Cal.2d 255, concluded that "the district attorney's involvement did not create a potential for bias or the appearance of a conflict of interest." Stark argues the trial court erred in that determination, and claims the ruling must be reviewed under *Greer* standard.

*2. Analysis*

Stark relies on *Greer*, *supra*, 19 Cal.3d 255, to assert that he may challenge the indictment under section 995 by showing that the district attorney suffered from a conflict of interest "which might prejudice him against the accused and thereby affect, *or appear to affect*, his ability to impartially perform the discretionary functions of his office." (*Greer,* at p. 269, italics added.) He argues that the subsequent enactment of section 1424 had no effect on *Greer*'s applicability to motions to set aside an indictment.

*Greer* involved a motion to disqualify the prosecutor before trial. The *Greer* court concluded the trial court had the inherent power to disqualify the district attorney in order to ensure that a fair trial would be achieved. In dictum, the *Greer* court stated: "We do not mean to deny that the same conflict of interest which disqualifies a prosecutor from participating in the trial of a criminal case may not also taint the procedure by which the defendant was charged, if the same district attorney participated therein. [Citations.] Thus, if the trial court determines that a district attorney's participation in the filing of a criminal complaint or the preliminary hearing on that complaint created a potential for bias or the appearance of a conflict of interest, it may conclude that the defendant was not 'legally committed' within the meaning of Penal Code section 995, and the

information should be set aside." (*Greer*, *supra*, 19 Cal.3d at p. 263, fn. 5, hereafter *Greer* footnote.)

Three years after the *Greer* decision, the Legislature enacted section 1424, "[r]esponding to an increase in the number of recusals, which the Attorney General attributed in part to *Greer*'s 'appearance' standard . . . ." (*People v. Vasquez* (2006) 39 Cal.4th 47, 59 (*Vasquez*); see *People v. Eubanks* (1996) 14 Cal.4th 580, 591, fn. 3.) Section 1424 provides that motions to disqualify the district attorney may not be granted "unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." "[W]hether the prosecutor's conflict is characterized as actual or only apparent, the potential for prejudice to the defendant — the likelihood that the defendant will not receive a fair trial — must be real, not merely apparent, and must rise to the level of a *likelihood* of unfairness. Thus section 1424, unlike the *Greer* standard, does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*People v. Eubanks, supra,* 14 Cal.4th at p. 592.)

Nevertheless, in *People v. Eubanks, supra,* 14 Cal.4th 580, we referred to the *Greer* footnote: "One should note, in this connection, the distinction between a motion to recuse the district attorney, under section 1424, and a motion to set aside the information or indictment, under section 995. In *Greer* we suggested that 'if the trial court determines that a district attorney's participation in the filing of a criminal complaint or the preliminary hearing on that complaint created a potential for bias or the appearance of a conflict of interest, it may conclude that the defendant was not "legally committed" within the meaning of Penal Code section 995, and the information should be set aside.' (*Greer*, *supra*, 19 Cal.3d at p. 263, fn. 5.) We expressly reserve the question whether availability of a remedy under section 995 was affected by the addition of section 1424 and thus express no

53

opinion here regarding what standard would govern motions brought under section 995." (*People v. Eubanks, supra,* 14 Cal.4th at p. 592, fn. 4.)

*Greer* concerned the disqualification of a prosecutor from participating in an upcoming trial. As we have noted, its observations regarding the possible setting aside of an information were dictum. *Eubanks* concerned disqualifications under section 1424, and its footnote served simply to note the distinction between those motions and motions to set aside accusatory pleadings, without expressing any opinion on the viability of *Greer* in the latter context. Nevertheless, Stark argues the *Greer* standard remains applicable to setting aside an indictment. Stark is wrong.

An examination of the *Greer* footnote does not indicate that it was intended to apply to a motion to set aside an indictment. The *Greer* footnote addressed only the district attorney's participation in the filing of a criminal complaint or in a preliminary hearing. The *Greer* court suggested that an appearance of a conflict of interest at those portions of the proceedings may demonstrate that a defendant was not "legally committed" within the meaning of section 995, subdivision (a)(2)(A), requiring the *information* be set aside. (*Greer, supra,* 19 Cal.3d at p. 263, fn. 5, italics added.)[23] Indictments, on the other hand, are governed by section 995, subdivision (a)(1), which omits the "legally committed" language.[24]

---

[23] The phrase "legally committed" is contained in section 995, subdivision (a)(2)(A), which requires that an *information* be set aside if the defendant was not "legally committed." " ' "The phrase 'legally committed,' . . . refers to the examination of the case and the holding of the defendant to answer . . . ." ' " (*Jennings v. Superior Court* (1967) 66 Cal.2d 867, 874.)

[24] Section 995, subdivision (a)(1)(A) provides the indictment shall be set aside if it "is not found, endorsed, and presented as prescribed in this code," i.e., "part 2, title 5, chapter 1, of the Penal Code beginning with section 940." (*People v. Jefferson* (1956) 47 Cal.2d 438, 442.) Section 995, subdivision (a)(1)(B) provides the indictment shall be set aside when the accused has been indicted "without reasonable or probable cause."

*(footnote continued on next page)*

Stark complains that it would be "anomalous" to require a defendant charged by indictment to meet a different legal standard than a defendant charged by information. Even as to a motion to set aside an information, however, the *Greer* dictum is not viable. When the Legislature superseded the *Greer* standard by enacting section 1424, it necessarily rejected that standard for all purposes. To maintain the *Greer* dictum could lead to the absurd result of dismissing the prosecutor's information in the absence of grounds to disqualify the prosecutor, a circumstance the Legislature could not have intended in enacting section 1424.

The question here is not whether the defunct *Greer* standard applies. The question is whether Stark was denied due process. This court has recognized that the manner in which the grand jury proceedings are conducted may result in a denial of a defendant's due process rights, requiring dismissal of the indictment. (*Backus, supra*, 23 Cal.3d at pp. 392-393.)[25] That showing requires a demonstration that the prosecutor suffered from a conflict of interest that substantially impaired the independence and impartiality of the grand jury. (*Ibid*.) Stark has failed to make such a showing. Both as to the indictment and

---

*(footnote continued from previous page)*

Stark observes that the *Greer* footnote, in making a general observation that a conflict of interest may taint the charging procedure, cites *Corbin v. Broadman* (1967) 6 Ariz.App.436, which involved a grand jury indictment. The Arizona case is distinguishable. There, the court concluded that Arizona Rules of Criminal Procedure permitted the quashing of an indictment on the ground that the prosecutor, who had a conflict of interest, was an unauthorized person present during grand jury proceedings. (*Id*. at pp. 440-441.)

[25] The parties disagree on the means by which a defendant may challenge an indictment under Penal Code section 995 and an accusation under Government Code section 3060 on the basis of a district attorney's conflict of interest. Stark argues that his claims are properly raised under those statutes, although he does not clearly explain how. The People argue that Stark is limited to making a nonstatutory due process motion. We need not resolve these questions here. Stark has failed to establish his entitlement to relief on any basis.

accusation, Stark has confined his arguments to the untenable position that a conflict sufficient to satisfy the *Greer* standard was enough to garner the relief he sought. Moreover, having failed to make a showing sufficient to disqualify the district attorney under section 1424 on identical facts,[26] it is plain that Stark could not make the more stringent showing required to establish a violation of due process. (See *Vasquez*, *supra*, 39 Cal.4th at pp. 58-59.)

---

[26] As we have noted, Stark's disqualification motion was denied by the trial court, and the record does not indicate he sought relief from that ruling by pretrial petition. (See *Vasquez*, *supra*, 39 Cal.4th at p. 68.)

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**KENNARD, ACTING C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**DUFFY, J.   \***
**DONDERO, J.   \*\***

_____
\*    Associate Justice, Court of Appeal, Sixth Appellate District, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

\*\*    Associate Justice, Court of Appeal, First Appellate District, Division One, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

57

**CONCURRING OPINION BY KENNARD, J.**


Here, the court holds, among other things, that an indictment may be set aside under Penal Code section 995 on the ground that the grand jury was wrongly instructed on the mental state required for an offense.  (Maj. opn., *ante*, at pp. 2, 39.)  This holding is logically compelled by *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018 (*Cummiskey*), which held that a claim of instructional error regarding the standard of proof is cognizable under Penal Code section 995.  (*Cummiskey*, *supra*, at p. 1022, fn. 1.)  I dissented on that point in *Cummiskey*, arguing that Penal Code section 995 does not authorize a court to set aside an indictment on the ground of instructional error.  (*Cummiskey*, at pp. 1038-1040 (conc. & dis. opn. of Kennard, J.).)  But *Cummiskey* now has the force of precedent, and, as I have stated before, "reiteration of dissenting views is rarely justified."  (*International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles* (2010) 48 Cal.4th 446, 461 (conc. opn. of Kennard, J.); see also *Porter v. Superior Court* (2009) 47 Cal.4th 125, 142.)  Therefore, I join in the majority's holding on this issue.


KENNARD, J.


1

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Stark v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 140 Cal.App.4th 567
**Rehearing Granted**

_____

**Opinion No.** S145337
**Date Filed:** August 1, 2011

_____

**Court:** Superior
**County:** Sutter
**Judge:** H. Ted Hansen

_____

**Counsel:**

Rothschild, Wishek, Chastaine & Sands, Rothschild, Wishek & Sands, M. Bradley Wishek, Quin A. Denvir; and Marilyn Fisher for Petitioner.

No appearance for Respondent.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Manuel M. Medeiros, State Solicitor General, Donald E. de Nicola, Deputy State Solicitor General, Mary Jo Graves and Michael P. Farrell, Assistant Attorneys General, Michal A. Canzoneri, Janet Neeley and Clifford E. Zall, Deputy Attorneys General, for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

M. Bradley Wishek
Rothschild, Wishek & Sands
901 F Street, Suite 200
Sacramento, CA  95814
(916) 444-9845

Clifford E. Zall
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5281