Filed 3/4/22  P. v. Wessman CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JOHN WESSMAN,<br><br>Defendant and Respondent.</td><td>E076327<br><br>(Super.Ct.No. INF1901460)<br><br>OPINION</td></tr>
</table>

APPEAL from the Superior Court of Riverside County.  Harold W. Hopp, Judge. Reversed.

Michael A. Hestrin, District Attorney, and Emily R. Hanks, Deputy District Attorney, for Plaintiff and Appellant.

Keker, Van Next & Peters, Elliot R. Peters, Steven A. Hirsch, Steven P. Ragland, Patrick E. Murray; Rodney Lee Soda, Rodney Lee Soda and David Greenberg for Defendant and Respondent.

1

# I. INTRODUCTION

Defendant and respondent John Wessman was a prominent real estate developer in the City of Palm Springs (the City). Codefendant Richard Meaney (Meaney) was a business associate of defendant and codefendant Stephen Pougnet (Pougnet), who served as the City's mayor from 2007 until 2015. In February 2017, the People filed a criminal complaint against all three individuals and, in August 2019, a grand jury returned a 30-count indictment against them. The indictment charged defendant with nine counts of bribery (Pen. Code,[1] § 67, counts 2, 4, 6, 8, 10, 12, 14, 16, & 18) and one count of conspiracy to commit bribery (§ 182, subd. (a), count 30).

On December 4, 2020, the trial court granted defendant's motion to set aside the indictment pursuant to section 995, and dismissed all counts against defendant on the basis that the evidence was not sufficient to sustain the indictment.[2] The People appeal from this order. Based upon our independent review of the record, we conclude the evidence before the grand jury was sufficient to support the indictment and that the alternative grounds for affirmance of the order suggested by defendant are not supported by the record. Accordingly, we reverse the order granting defendant's motion to set aside the indictment.

---

[1] Undesignated statutory references are to the Penal Code.

[2] The trial court denied similar motions brought by Meaney and Pougnet, and they are not parties to this appeal.

## II. FACTS & PROCEDURAL HISTORY

### A. *Summary of Relevant Evidence Before the Grand Jury*[3]

#### 1. Testimony of City Manager

The city manager testified that defendant was a well-known real estate developer in the City. One of defendant's largest projects was the downtown project, which involved the complete redevelopment of an abandoned shopping mall considered a blight on the City's tourism economy (Downtown Project). The Downtown Project had been a high priority among city council members for years, and the City had considered multiple actions to spur redevelopment of the property, including the use of eminent domain. Ultimately, the City entered into a public-private partnership with defendant's company, in which the City would contribute $50 million to the redevelopment, while defendant's company would contribute $200 million.

The city council established a subcommittee specifically for the purpose of managing the Downtown Project, of which Pougnet was a member. The subcommittee would meet regularly with defendant's company; was responsible for resolving numerous issues related to the construction, aesthetics, and management of the Downtown Project; and would reserve only the largest decisions to be made by the full city council. The city

---

[3] Because the grand jury proceedings involved the investigation of multiple individuals, and the indictment included charges against Pougnet, in addition to the bribery allegations against defendant, we summarize only the evidence related to the counts alleged against defendant.

manager believed Pougnet would not have been eligible to serve on this subcommittee, if it had been known that Pougnet had a financial relationship with defendant.

In addition to the Downtown Project, the city manager confirmed that between 2012 and 2014, defendant also had other development projects subject to approval or review by the city council, including hotel operations agreements; a housing development project (Pedregal Project); and the development of a gated community (Dakota Project). Pougnet did not recuse himself from the city council's decisions involving any of these developments, although many of these votes were unanimous and in accordance with recommendations by city staff. With respect to the Pedregal Project, Pougnet's vote was a decisive vote in obtaining an outcome more favorable to defendant.

2. Testimony of Director of Community and Economic Development

The former director of community and economic development for the City testified that defendant was the largest locally based developer in the City. Defendant's company acquired a mostly abandoned shopping mall in the City's downtown area in 2001, but struggled to redevelop the property for many years. During this time, Pougnet was opposed to defendant's vision for redeveloping the property, and he was an active proponent of using eminent domain to take possession of the property. In 2010, the city council authorized taking the initial steps needed to begin an eminent domain action and hired an independent firm to develop an alternative plan for the property's redevelopment. However, after consulting with hundreds of community members, the plan ultimately developed was very similar to the plans originally proposed by defendant

and, as a result, the City decided to pursue redevelopment through a public-private partnership with defendant.

The director also recalled that Pougnet was a deciding vote on a proposal by defendant related to the Pedregal Project. A prior developer had obtained approval for the project, performed some preliminary work, but lost the property in foreclosure. Defendant had purchased the property and proposed the city council enforce or transfer the prior developer's completion bond to fund completion of infrastructure related to the project. The director believed such a request was unusual in situations in which a subsequent developer assumes a project with the intent to complete it. Defendant's request was ultimately approved in 2012 by a vote of 3 to 2 by the city council, with Pougnet voting in the majority, resulting in a financial "windfall" to defendant.

3. Testimony of City Council Members

C.M. testified he was a member of the city council from 2001 through 2017. He served alongside Pougnet on the City's subcommittee for the Downtown Project. C.M. explained that the public-private partnership for the Downtown Project involved an agreement by the City to purchase all of the land dedicated to streets and parking from defendant. However, the money paid would only be used to fund other aspects of the redevelopment subject to the City's ongoing approval. C.M. also recalled the vote on the Pedregal Project and expressed the view that defendant's request for the City to call or transfer a prior developer's completion bond was unfair, outside the general practice of the City, and represented a significant financial advantage of at least $1,000,000 to defendant.

5

G.F. testified she was a member of the city council from 2003 to 2017. With respect to the Downtown Project, the city council established a subcommittee that handled the details of the redevelopment. Subcommittee meetings that involved negotiation of terms and conditions of the Downtown Project were not open to the public or to the press. One of the subcommittee members would regularly report matters back to the city council, but the city council rarely changed any of the decisions negotiated, and agreed to, by the subcommittee.

P.L. testified that he also served as a city council member from 2011 through 2015. He recalled that shortly after being elected, Pougnet arranged for P.L. to meet with Meaney and asked P.L. to " 'listen' " to what Meaney had to say. Meaney discussed the issue of public improvement bonds in relation to an upcoming vote regarding the Pedregal Project. P.L. understood the project was being developed by defendant and was uncertain why Meaney was speaking to him about the project. P.L. did not recall ever personally meeting with defendant.

4. Testimony of H.M.

H.M. testified that he owned an advertising company, was the chairman of the Palm Springs International Film Festival (PSIFF), and was involved with various other social organizations in the City. In 2011, he attended a regular meeting of organizers advocating for the passage of a city sales tax that had been submitted to voters for approval. There were about 20 people present, including defendant and Pougnet. Instead of discussing advocacy of the tax proposal, Pougnet unexpectedly announced to everyone in attendance that he could not run for reelection unless he obtained a job in the

6

community. The meeting then turned into a discussion regarding how Pougnet could be convinced to run for reelection.

In response, the PSIFF offered Pougnet a job as a fundraising consultant to be paid $150,000 annually, or $12,500 per month, and first paid Pougnet in January 2012. According to H.M., Pougnet was credited with subsequently bringing in many large donors this first year. However, the contract was contingent on Pougnet bringing in more donations than his salary; there was a drop off in fundraising activity associated with Pougnet after his first year; and the PSIFF subsequently cut Pougnet's annual salary to $75,000 in the subsequent years.

H.M. confirmed that defendant was a founding donor to the PSIFF and served on the PSIFF's board the entire time the PSIFF employed Pougnet. H.M. also confirmed the PSIFF had received a donation of $75,000 from defendant but, for reasons unknown to him, had to return that donation in May 2012.

5. E-mail Evidence

A special agent with the Federal Bureau of Investigation (FBI) testified that she reviewed multiple e-mails as part of the investigation of Pougnet.

In May 2011, Meaney sent an e-mail to Pougnet, stating: "Meeting with John on Tuesday. They have spok[en] to Harold. I believe everything is in place. The big question from everyone, including Curt, is what are your plans? . . . Hard to nail everyone down when you're leaving your options open. When are you going to commit to something?" In response, Pougnet sent an e-mail stating: "I need to know that an offer is very real, that I am an employee somewhere that has a letter 'of employment.'

7

That will make a decision much easier to make." In response, Meaney sent an e-mail asking: "If it is 220 annually, will you commit?" Pougnet countered with: "$225,000. When I know exactly what it is, I will sit down with [my husband], and we will make a decision." The agent expressed the belief that "John" referred to defendant and "Harold" referred to H.M., given the discussion about Pougnet's need to make a decision in relation to the prospect of employment.

In a second set of e-mails exchanged in June 2012, Meaney, defendant, and another executive in defendant's company discussed the bankruptcy of the developer who owned the Pedregal Project, acquisition of the property in foreclosure, and anticipated votes by the city council related to the project.

6. Testimony of District Attorney Investigator

An investigator with the Riverside County District Attorney's Office testified that he was involved with an investigation of Pougnet. The investigation was initiated in response to allegations of conflicts of interest involving Pougnet made by political activists and local media. Based upon his public disclosure forms, Pougnent reported receiving no income other than his mayoral salary in 2010 and 2011. However, beginning in 2012, Pougnet reported receiving a significant amount of money from PSIFF, a company owned by S.M., and later a different company owned by Meaney.

In October 2016, the investigator obtained a search warrant for review of Pougnet's bank account information. Over the course of the next five months, the investigator obtained additional search warrants for financial records related to individuals and transactions based upon his review of Pougnet's bank records. These

8

records included those of defendant, defendant's businesses, Meaney, Meaney's business, and other third parties. Based upon his review of these records, the investigator noted several transactions he found suspicious.

In September 2012, within a span of 10 days, the following transactions occurred: a company owned by S.M. issued a check to Pougnet, a company owned by Meaney issued a check to S.M.'s company, Meaney invoiced defendant's company for consulting work, and defendant's company paid Meaney's invoice. In November 2012, a similar sequence of events occurred: Meaney's company issued a check to S.M.'s company, S.M.'s company issued a check to Pougnet the following day, Meaney invoiced defendant's company for consulting work one day later, and defendant paid Meaney's invoice a few days after that invoice. In December 2012, a similar set of events occurred again: Meaney invoiced defendant's company, defendant paid the invoice the next day, Meaney wrote a check to S.M.'s wife the same day that he was paid by defendant, and Pougnet received a check from S.M.'s company the following day. While the specific amounts transferred in each transaction differed, the transactions taken as a whole amounted to exactly $75,000 transferred from defendant's company to Meaney's company; $75,000 transferred from Meaney's company to S.M.; and $75,000 transferred from S.M.'s company to Pougnet.[4]

---

[4] The investigator also noted that the $75,000, when combined with Pougnet's new salary with the Film Festival, would have amounted to $225,000—the amount Pougnet suggested would be sufficient to convince him to run for reelection in 2011.

In 2013, the following transactions occurred: a payment of $100,000 from defendant to Meaney's company in May 2013, a payment of $75,000 from Meaney's company directly to Pougnet a few days later, and a second payment of $25,000 from Meaney's company directly to Pougnet five months later. In November 2013, Meaneys' company issued a third payment directly to Pougnet for $50,000 and, a few days later, defendant's company paid Meaney's company $50,000. Again, the investigator noted that, when viewed together, the transactions showed that in the year 2013, exactly $150,000 had been transferred from defendant to Meaney's company, and that Meaney's company transferred exactly $150,000 to Pougnet.

In 2014, the following transactions occurred: between January and March, defendant signed three checks to Meaney's company totaling $63,650.09 and, on the same date that the last of these checks was issued, Meaney's company issued a check to Pougnet for $60,000. In April 2014, Meaney's company issued a check to Pougnet for $15,000 and, a few days later, defendant signed two checks to Meaney's company totaling $17,719. Finally, in September 2014, defendant signed a check to Meaney's company for $225,000. That same day, Meaney transferred $150,000 to an account for a joint business venture he had with defendant and wrote a check to Pougnet for $75,000.

Finally, the investigator identified at least 13 instances in which Pougnet voted to support projects that benefitted defendant or Meaney while Pougnet was serving on the city council in 2012, 2013, and 2014. According to the investigator, given the financial relationship indicated in the bank records for these individuals, these were instances in which Pougnet should have recused himself.

10

7.  Testimony of S.M.

S.M. testified he has been in the real estate business for more than 25 years and developed both a business and social relationship with Meaney. In 2012, Meaney asked S.M. to facilitate several payments to Pougnet as a favor. Meaney wrote three checks to S.M.'s company and in turn, S.M. caused three checks totaling the same amount to be written to Pougnet. S.M. acknowledged the money was not intended as an official campaign donation and described himself as a "middle man" to simply facilitate the transfer of money to Pougnet. S.M. never spoke with Pougnet about the payments and did not expect Pougnet to provide any services in exchange for the payments. S.M.'s company simply provided a tax form to Pougnet corresponding with each payment. S.M. recalled that Meaney specifically asked the checks to Pougnet be written through S.M.'s company.

B. *Indictment and Section 995 Motion*

On August 15, 2019, the grand jury returned an indictment against defendant, Meaney and Pougnet. The indictment accused defendant of nine counts of offering a bribe (§ 67, counts 2, 4, 6, 8, 10, 12, 14, 16, 18). The counts arose out of the nine total payments to Pougnet in 2012, 2013, and 2014. The indictment also accused defendant of one count of conspiracy to commit bribery (§ 182, subd. (a), count 30). Finally, the indictment alleged that the statute of limitations was tolled because the offenses could not have been reasonably discovered earlier as a result of Pougnet's false statements in his public disclosure forms.

11

On November 13, 2019, defendant filed a motion to set aside the indictment pursuant to section 995.  On December 4, 2020, the trial court granted defendant's motion, concluding there was insufficient evidence to sustain the allegations in the indictment against defendant.  The People appeal from this order.

### III.  DISCUSSION

A.  *The Evidence Was Sufficient To Support the Indictment*

On appeal, the People contend the trial court erred in concluding there was insufficient evidence to support the grand jury's indictment of defendant on nine counts of bribery and one count of conspiracy to commit bribery.  Upon our independent review of the record, we believe the evidence was sufficient to provide probable cause for the indictment and, as such, the trial court erred in granting defendant's section 995 motion based upon the insufficiency of the evidence.

1.  General Legal Principles and Standard of Review

"The role of the grand jury in an indictment proceeding is to 'determine whether probable cause exists to accuse a defendant of a particular crime.'  [Citation.]  Probable cause ' " 'means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused.' " '  [Citations.]  The grand jury serves as the functional equivalent of a magistrate who presides over a preliminary examination on a felony complaint.  'Like the magistrate, the grand jury must determine whether sufficient evidence has been presented to support holding a defendant to answer on a criminal complaint.' "  (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 406 (*Stark*).)

"In a section 995 proceeding, the trial court may set aside the indictment only if the grand jury acted 'without reasonable or probable cause.' " (*People v. Pic'l* (1982) 31 Cal.3d 731, 737.) This is the same standard applied to the review of a magistrate's determination at a preliminary hearing. (*Munoz v. Superior Court* (2020) 45 Cal.App.5th 774, 778-779.) It is " 'an "exceedingly low" standard.' " (*Id.* at p. 779.) "To establish probable cause sufficient to overcome a section 995 motion, 'the People must make some showing as to the existence of each element of the charged offense.' [Citation.] 'Evidence that will justify a prosecution need not be sufficient to support a conviction.' " (*People v. Scully* (2021) 11 Cal.5th 542, 582 (*Scully*).)[5]

---

[5] On more than one occasion, defendant implies that probable cause does not exist where the evidence may be equally susceptible to innocent explanations, citing to *Malleck v. Superior Court of San Francisco* (1956) 142 Cal.App.2d 396, 399. In that case, the Court of Appeal held that evidence was insufficient to support an indictment where "it is still as probable that the petitioner did not commit the crime as that he did," relying solely on the generic definition of the term " 'probable' " as meaning "having more evidence for than against." (*Ibid.*) However, we have found no California published decisions that have cited to *Malleck* for this definition of probable cause. Nor does this definition appear consistent with the definition widely recognized today.

As numerous California authorities have recognized, the standard test of reasonable or probable cause to support an indictment is the same as that used in considering the issuance of a search warrant, an arrest without a warrant, and a commitment by a magistrate. (*People v. Aday* (1964) 226 Cal.App.2d 520, 532-533; *People v. Pease* (1966) 242 Cal.App.2d 442, 445-446.) And in these other contexts, the California Supreme Court has repeatedly affirmed that the possibility of an innocent explanation does not vitiate probable cause. (*People v. Souza* (1994) 9 Cal.4th 224, 233 [finding probable cause for warrantless detention and explaining, "[a] different result is not warranted merely because circumstances known to an officer may also be ' "consistent with lawful activity" ' "]; *People v. Brown* (2015) 61 Cal.4th 968, 985-986 [" ' "[T]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." ' "].) In the context of

13

" 'When we review a section 995 motion, we "disregard[] the ruling of the superior court and directly review[] the determination of the magistrate." ' " (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 544-545; *People v. Superior Court* (Costa) (2010) 183 Cal.App.4th 690, 699.) A reviewing court considers the evidence in the light most favorable to the indictment (*People v. Manson* (1976) 61 Cal.App.3d 102, 167; *People v. Guzman* (2011) 201 Cal.App.4th 1090, 1096); it does not "substitute its judgment as to the weight of the evidence for that of the grand jury, and must draw all reasonable inferences in favor of the indictment" (*Stark*, *supra*, 52 Cal.4th 368 at pp. 406-407). A reviewing court will not set aside an indictment " ' "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " (*Scully*, *supra*, 11 Cal.5th at p. 582; *Zemek*, at pp. 544-545.)

2. The Evidence Was Sufficient To Support the Grand Jury's Indictment

Here, the indictment alleged nine counts of bribery in violation of section 67 against defendant, with each count corresponding to specific, alleged payments to Pougnet in 2012, 2013, and 2014. It also alleged one count of conspiracy to commit

---

a grand jury indictment, where the standard sufficient to support an indictment is met, the fact that there may also be an innocent explanation for defendant's actions is not grounds for setting aside the indictment. The grand jury is not under any legal obligation to accept the innocent explanation. (*People v. Kegley* (1961) 198 Cal.App.2nd 501, 502.) Thus, it is now widely understood that a trial court may not dismiss an indictment based upon its own view of the relative weight to be afforded the evidence. (*People v. Evans* (1959) 175 Cal.App.2d 274, 276 ["It is now well settled that on hearing a motion to dismiss . . . the Superior Court may not reweigh the evidence . . . ."]; *Kegley*, at p. 502 [same].)

bribery, listing the nine payments to Pougnet as overt acts in furtherance of the conspiracy.

Section 67 provides: "Every person who gives or offers any bribe to any executive officer in this state, with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer, is punishable by imprisonment . . . ." Additionally, "[c]riminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.) It "requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*Ibid.*) Further, "an overt act" in furtherance of the agreement " 'need not amount to a criminal attempt and it need not be criminal in itself.' " (*People v. Joseph* (2021) 63 Cal.App.5th 1058, 1066.)

Drawing all inferences in the light most favorable to the indictment, we believe the evidence here was sufficient to support the bribery and conspiracy charges. First, the evidence permitted the jury to infer that defendant was directly involved in funding payments to Pougnet. Defendant personally signed all of the checks alleged to constitute the source of the funds used to bribe Pougnet. The payments were made to various intermediary companies, but the owner of one of those companies testified that he was simply used as a "middle man" to transfer money to Pougnet. While the amount of each payment made between intermediaries differed at times, the total amount disbursed

15

by defendant matched the exact amount ultimately received by Pougnet in the years 2012 and 2013, even though one of the intermediary companies ceased to be involved in 2013. We acknowledge it is possible that the identical sums are merely a matter of mathematical coincidence, but it is also clearly reasonable for the grand jury to infer that Pougnet was the intended recipient of the payments disbursed by defendant under these facts.

Further, while the amount disbursed by defendant to Meaney, and the amount ultimately received by Pougnet, differed significantly in 2014, the total sum disbursed by defendant was clearly sufficient to fund all of the payments ultimately received by Pougnet.[6] Moreover, on at least one occasion, defendant wrote a check for $225,000 to Meaney and, on that same day, Meaney transferred $150,000 into the separate account of a joint venture in which defendant was an investor, and then wrote a check to Pougnet for the remaining $75,000. Given the fact that the joint venture had its own account, there was no apparent reason for defendant to use Meaney as an intermediary to invest money into that venture. As such, at least one reasonable inference that can be drawn from his decision to do so is that the transfer of money to Meaney was intended to hide a payment to Pougnet.

Second, there was evidence that Pougnet was in a position to influence numerous official actions on behalf of defendant, as well as evidence that Pougnet failed to recuse

---

[6] The testimony suggested defendant disbursed a total of $490,000 to Meaney and to Meaney's company while Pougnet ultimately received $150,000 from Meaney's company in 2014.

himself from decisions related to these actions. Multiple development projects by defendant's company were subject to review and approval from the city council during this time period, and Pougnet did not recuse himself when voting on any of these matters. There was evidence that Pougnet assisted in lobbying other city councilmembers on issues that were beneficial to defendant, such as arranging for Meaney to meet with another councilmember to discuss a vote financially favorable to defendant. Even if we ignored the details surrounding this specific vote,[7] the evidence certainly gives rise to a reasonable inference that defendant was in a position, and was willing, to use his influence to lobby other city councilmembers into voting on matters in a manner favorable to defendant's interests. Finally, Pougnet continued to serve as a member of the subcommittee charged with deciding most of the details related to the Downtown Project throughout the entire relevant time period. The testimony suggested that serving on this subcommittee placed Pougnet in an even more influential position to advance

---

[7] Defendant contends that any payment in 2012 could not have been intended to influence Pougnet's vote on the Pedregal Project because the vote was held in July 2012, and the alleged payments to Pougnet began two months after. The timing of Pougnet's actual receipt of payments is not necessarily dispositive in this case. There was also evidence that prior to the vote on the Pedregal Project, defendant had made a donation of $75,000 to the PSIFF. By this time, Pougnet was employed by the PSIFF as a fundraiser, and Pougnet's salary was expressly tied by contract to the amount of donations he could generate for the PSIFF. However, PSIFF returned defendant's donation in May 2012 for reasons that remain undisclosed. Given that the amount of the returned donation again coincides with the exact amount ultimately received by Pougnet in 2012, the grand jury would have been entitled to infer that defendant initially attempted to use the PSIFF as an intermediary to transmit funds to defendant prior to the Pedregal vote, but when that proved unsuccessful, he had to resort to alternate intermediaries.

17

defendant's interests, and that Pougnet should have recused himself from serving, given his financial relationships.

Given this evidence, it would have been reasonable for a grand jury to infer that defendant caused money to be transferred to Pougnet for the purpose of influencing Pougnet in acts, votes, or opinions related to matters within Pougnet's official duties.

Further, because the evidence also showed that the payments made by defendant were always made to an intermediary, the same evidence would be sufficient to support an inference that defendant participated in a conspiracy with respect to the payments. We acknowledge that the evidence presented to the grand jury was largely circumstantial. Nevertheless, the evidence is not so lacking that a reasonable person could not be led to believe and conscientiously entertain a strong suspicion that defendant committed the alleged offenses. That is all that is required to avoid dismissal under section 995. It is plainly inferable from the evidence that there is some rational ground for assuming the possibility that the bribery and conspiracy offenses charged have been committed and the defendant is guilty of them. As such, it was error for the trial court to grant defendant's section 995 motion.

3. Defendant's Arguments Regarding the Insufficiency of the Evidence Are Unpersuasive

Defendant argues that the evidence before the grand jury in this case cannot support the indictment because (1) the evidence in this case is weaker than that found lacking in *Dong Haw v. Superior Court of Sacramento County* (1947) 81 Cal.App.2d 153 (*Dong Haw*); (2) there was no evidence of defendant's intent; and (3) the grand jury was

18

"overwhelmed" with irrelevant evidence related to other individuals who were not subject to the allegations against defendant. As we explain below, we do not find any of these arguments sufficient grounds for setting aside the indictment.

a. *Dong Haw* is distinguishable

In *Dong Haw*, the Court of Appeal granted writ relief in favor of a defendant indicted on one count of conspiracy to commit bribery on the ground that insufficient evidence supported his indictment. (*Dong Haw*, *supra*, 81 Cal.App.2d at pp. 154, 160.) Defendant argues that the evidence in this case compels the same conclusion because it is weaker than that presented in *Dong Haw*. However, *Dong Haw* is clearly distinguishable. In that case, the evidence before the grand jury showed that the defendant's son delivered a case of assorted liquor, money, and a letter to a city manager. (*Id.* at pp. 155-156) The letter was written by the defendant's daughter and raised concerns over the fact that the city's chief of police had closed a social club that rented space on the defendant's property. (*Id.* at pp. 156-157.) The Court of Appeal found such evidence insufficient to support the indictment against the defendant, noting that his only connection with the alleged bribe was his familial relationship with the individuals actually alleged to have engaged in the acts constituting the bribe. (*Id.* at p. 158.)

While the Court of Appeal in *Dong Haw* did not suggest what additional evidence might have been sufficient to support an indictment, the California Supreme Court subsequently did so in *Lorenson v. Superior Court of Los Angeles County* (1950) 35 Cal.2d 49 (*Lorenson*). In distinguishing *Dong Haw*, the high court stated: "[T]he only links connecting [the defendant] with the alleged conspiracy was his parental

19

relation to the other actors, his ownership of the building in which [the interested tenant] was located, and ownership of a truck used to deliver some liquor. Other than as landlord, he had no connection with the club which was being closed . . . , and it affirmatively appeared that a letter bearing his name was not signed by him or with his knowledge or consent. There was no evidence, direct or circumstantial, tending to prove that [the defendant] had ever participated in the bribery, if that crime was committed, or from which it reasonably might be inferred that he was interested in obtaining any favor from the police . . . ." (*Id.* at p. 58.) Thus, our Supreme Court implied that the two crucial pieces of evidence lacking in *Dong Haw* were (1) some direct involvement in an act alleged to constitute the bribe, and (2) evidence to suggest the defendant had an interest in obtaining favorable treatment from the official allegedly bribed.

As we have already explained, the grand jury in this case had both evidence of defendant's direct involvement in the actions alleged to constitute the bribes and evidence of defendant's interest in obtaining favorable treatment from Pougnet. There was direct evidence that defendant signed each of the checks alleged to have funded the payments to Pougnet and ample evidence that defendant had a direct financial interest in official matters subject to Pougnet's influence, whether in his votes as a city councilmember or in his participation in the subcommittee overseeing the Downtown Project. Given this evidence, we disagree with defendant's characterization of the evidence in this case as being weaker than that in *Dong Haw*.

b. There was sufficient circumstantial evidence of intent

Defendant also argues that there was no evidence to support the essential element of intent. Again, we disagree. "The specific intent to commit the crime of bribery is an essential element of the charge, but the trier of fact may resort to circumstantial evidence to determine its existence . . . ." (*People v. Meacham* (1967) 256 Cal.App.2d 735, 744.) We have found no published authority discussing the sufficiency of circumstantial evidence to support an indictment related to the element of intent, and neither party has directed us to any such authority in their briefs. Nevertheless, we observe that several cases have discussed the sufficiency of circumstantial evidence of intent to support a conviction.

Thus, for example, in *People v. Gaio* (2000) 81 Cal.App.4th 919, evidence that (1) payments were made, (2) the recipient occupied a position that enabled him to beneficially advance the payor's interest, and that (3) the recipient did, in fact, act in the payor's interest was deemed sufficient to support a conviction for bribery. (*Id.* at pp. 931-932.) The Court of Appeal opined that under such circumstances, "it is plainly inferable that [the defendants] engaged in the various payments with the intent that [the recipient] be influenced to do so." (*Id.* at p. 932.)

Likewise, in *People v. Wong* (2010) 186 Cal.App.4th 1433, the Court of Appeal affirmed a conviction for bribery, concluding that "corrupt intent" could be inferred from the clandestine payment of funds; the failure of the recipient to disclose his relationship with the payor; the recipient's decision to continue acting in his official capacities,

21

impacting the payor's interests; and the cessation of payments as soon as the recipient left public office. (*Id.* at p. 1448.)

Finally, in *People v. Diedrich* (1982) 31 Cal.3d 263, our Supreme Court concluded that evidence that money was paid to an intermediary, the intermediary paid the defendant, and the defendant engaged in two official acts for the benefit of the payor was sufficient to support a conviction for bribery. (*Id.* at pp. 271-272.) Notably, the Supreme Court found such evidence would be sufficient, even if evidence of direct communications between the payor and the recipient regarding the subject of the bribe were entirely disregarded, and even in the face of evidence that there were a legitimate, alternative reasons for the payor to have hired and paid the intermediary. (*Ibid.*)

In each of these cases, evidence of payments made, and official actions taken in response to those payments, was considered sufficient circumstantial evidence of intent to support a conviction. Since " '[e]vidence that will justify a prosecution need not be sufficient to support a conviction' " (*People v. Slaughter* (1984) 35 Cal.3d 629, 637), similar and even less substantial circumstantial evidence would clearly be sufficient to support an indictment. As such, we cannot conclude that the circumstantial evidence in this case was lacking.

c. Presentation of other evidence is not grounds for dismissal

Defendant also complains at length that the People inundated the jury with

inadmissible and irrelevant evidence.[8]  Even if true, this argument is entirely irrelevant to our review of the sufficiency of the evidence.[9]

With respect to the sufficiency of the evidence, the California Supreme Court has repeatedly made clear that a reviewing court's role is limited and, as long as "there is some evidence to support the indictment, the courts will not inquire into its sufficiency." (*Greenberg v. Superior Court of San Francisco* (1942) 19 Cal.2d 319, 322; *Lorenson*, *supra*, 35 Cal.2d at p. 55; *People v. Crosby* (1962) 58 Cal.2d 713, 730.)  Thus, "[t]he presentation to the grand jury of inadmissible or tainted evidence does not in itself invalidate an indictment.  If sufficient competent evidence, exclusive of the challenged

---

[8]  We note that the premise of defendant's argument is highly questionable. Defendant appears to characterize any evidence that fails to directly reference his involvement in the alleged crime as inadmissible, reasoning that such evidence is irrelevant.  However, the charges being investigated by the grand jury included conspiracy to commit bribery.  With respect to this charge, " ' [o]ther than the agreement, the only act required is an overt act by *any* of the conspirators, not necessarily the defendant, and the overt act need not itself be criminal.' " (*People v. Ware* (2020) 52 Cal.App.5th 919, 938; *People v. Russo* (2001) 25 Cal.4th 1124, 1135 ["[A]ny one of the conspirators, and not necessarily the charged defendant, may commit the overt act to consummate the conspiracy."].)  Thus, the fact that evidence presented to the grand jury addressed acts taken by alleged coconspirators does not render such evidence irrelevant to the charges ultimately brought against defendant, and defendant's blanket assertion that all such evidence would be inadmissible on relevance grounds is not well founded. The respondent's brief identifies only a single instance in which an item of evidence was inadmissible on a ground other than its purported irrelevance.

[9]  The cases cited by defendant stand for the proposition that the grand jury's reliance on inadmissible evidence may result in setting aside the indictment on other grounds afforded by statute or based upon constitutional concerns of due process. (§ 939.6, subd. (b); *People v. Backus* (1979) 23 Cal.3d 360, 393.)  However, as we explain, *ante*, we do not believe such grounds exist in this case.

evidence, was presented to indict, the indictment will not be found defective." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 478; *Mason v. Superior Court* (2015) 242 Cal.App.4th 773, 787 [" '[T]he fact that evidence that would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury.' "].)

If, as here, relevant and admissible evidence in the record supports the essential elements of the offenses charged in the indictment, the presence of additional evidence that may be irrelevant or inadmissible does not somehow negate the existence of the admissible evidence in support of the indictment. Thus, defendant's argument that the presence of inadmissible or irrelevant evidence constitutes grounds for finding the evidence insufficient is without merit.

B. *The Record Does Not Support Defendant's Claims of Prosecutorial Misconduct*

Defendant contends that, even if sufficient evidence supports the indictment, the trial court's order can be affirmed on an alternative ground based upon alleged prosecutorial misconduct. Specifically, defendant argues the prosecutor engaged in misconduct by (1) failing to present exculpatory evidence to the jury as required by section 939.71, and (2) "improperly" questioning witnesses. We do not believe the record supports either of these claims.

1. The Record Does Not Show a Violation of Section 939.71

The prosecutor has a statutory duty to inform the grand jury of the nature and existence of exculpatory evidence and, thereafter, inform the grand jury of its power to order any additional evidence to be produced. (§ 939.71.) The failure to comply with

24

this statutory duty may, in some cases, justify setting aside an indictment. (See *Johnson v. Superior Court of San Joaquin County* (1975) 15 Cal.3d 248, 255 (*Johnson*); *People v. Becerra* (2008) 165 Cal.App.4th 1064, 1070.)

However, defendant concedes that the People in this case provided the grand jury with a defense letter that, in defendant's own words, contained a "detailed description of exculpatory material . . . and a collection of many exculpatory documents along with a description of how each document tended to negate the charges." The record confirms that the prosecutor informed the grand jury of this letter; made the identified documents available for the grand jury's review; and informed the grand jury of its statutory duty and power with respect to requesting additional evidence.[10]

Provision of such a defense letter, as well as an appropriate admonishment regarding the grand jury's duties under section 939.7, complies with the prosecutor's statutory duty in relation to the disclosure of exculpatory evidence. (See *People v. McAlister* (1976) 54 Cal.App.3d 918, 926 [Where a defense letter "in fact came to the

---

[10] In full, the prosecutor stated: "The last thing we're going to do by way of giving you over evidence is something that we call *Johnson.* . . . [¶] The grand jury is not required to hear evidence for the target, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced and, for that purpose, may require the deputy district attorney to issue process for the witness. [¶] As a part of this proceeding, we did provide all of the targets with the opportunity to provide whatever evidence they wanted you to have. That has been marked as Exhibit 54, which is a binder with a letter and some exhibits attached, and Exhibit 72, which is a letter. [¶] So we're providing you with these materials to review. And if there is anything that you wish for us to produce pursuant to that *Johnson* instruction, you let us know during your deliberations, and if we can, we will provide you with that information."

grand jury's attention, it is axiomatic that the district attorney's obligation under *Johnson* [is] discharged, albeit not directly by him."].)

Defendant's true complaint is not that the prosecutor failed to inform the grand jury of the existence of exculpatory evidence, but that the prosecutor should have done more to draw the jury's attention to the defense evidence or the arguments made by defense counsel in its letter. However, there is no authority for the proposition that the duty to inform the grand jury of the nature and existence of exculpatory evidence, and of its power to order any additional evidence to be produced, also requires the prosecutor to highlight particular items of evidence, present potential defense theories that might offer alternative explanations for that evidence, or make arguments on behalf of the defendant.[11]

With respect to defendant's complaint regarding the manner in which exculpatory evidence was presented to the jury, the California Supreme Court rejected a similar argument in *People v. Houston* (2012) 54 Cal.4th 1186, 1205-1206 (*Houston*). In that case, it was undisputed that the prosecutor disclosed the existence of video evidence to

---

[11] In fact, Justice Mosk's concurrence in *Johnson* expressly recognizes that such rights are not conferred by the statutory scheme, observing that, "If prosecution is begun by information the accused immediately becomes entitled to an impressive array of procedural rights, including a preliminary hearing before a neutral and legally knowledgeable magistrate, representation by retained or appointed counsel, the confrontation and cross-examination of hostile witnesses, and the opportunity to personally appear and affirmatively present exculpatory evidence"; "[b]y contrast, the indictment procedure is distinctive because of its deliberate omission" of such safeguards. (*Johnson*, *supra*, 15 Cal.3d at pp. 256-257.)

the grand jury, declined to present the evidence, but informed the grand jury of its right to request its production. (*Ibid.*) The defendant argued the manner of presentation was inadequate because the "prosecutor's statements dissuaded the grand jury from requesting the evidence and improperly implied that the recordings had no exculpatory value." (*Id.* at p. 1206.) The Supreme Court disagreed, concluding that regardless of the prosecutor's comments, the defendant suffers no prejudice warranting dismissal under section 995 where the jury is aware of the existence of the evidence and aware of its authority to request it. (*Ibid.*)

The manner in which the prosecutor presented the exculpatory evidence here is no different than that in *Houston*. The prosecutor openly acknowledged the existence of the defense letter as well as exhibits identified as exculpatory evidence and reminded the grand jury it had the power to request further production of any evidence for review. In fact, unlike in *Houston*, the prosecutor in this case actually included the alleged exculpatory evidence with the exhibits made available to the grand jury, instead of waiting for a further request from the grand jury to review the evidence. Thus, there was no violation of the prosecutor's statutory duty to inform the grand jury of the nature or existence of exculpatory evidence.

2. The Record Does Not Support Prosecutorial Misconduct Based Upon "Improper" Questioning

Defendant also contends the prosecutor engaged in misconduct because the record is "rife with leading questions, invitations for speculation, improper vouching for law-enforcement witnesses, irrelevant testimony, and needless argument and commentary

27

. . . ." We disagree that these constitute grounds for setting aside an indictment otherwise supported by sufficient evidence in the record.

The "grand jury proceeding is investigatory, not adversarial." (*People v. Petrilli* (2014) 226 Cal.App.4th 814, 825.) The statutory protections California has chosen to build into its grand jury proceedings do not change the proceeding's fundamental nature. (*People v. Brown* (1999) 75 Cal.App.4th 916, 931-932 [Statutory protections have not "transformed the grand jury proceeding from one that is investigatory to one that is adjudicatory."].) Because the grand jury serves as part of the charging process of criminal procedure, and not the adjudicative process, many of the rules intended to " 'protect the accused during trial-type confrontations with the prosecutor' " are generally not applicable. (*Ibid.*) For example, the subject of an investigation is not afforded a right to present his own theories, evidence, or argument (§ 939.7); not afforded a right to counsel even when summoned to appear before the grand jury (*Brown*, at pp. 931-932); and not afforded a right to grand jurors free from all bias (*Packer v. Superior Court* (2011) 201 Cal.App.4th 152, 165-166 [no right to screen grand jurors for potential bias in light of a grand jury's investigatory and accusatory role]).

When viewed in the correct context, it is apparent that the conduct of which defendant complains simply does not rise to the level of misconduct, let alone misconduct justifying setting aside an indictment otherwise supported by sufficient evidence. The prohibition against leading questions is a rule of evidence expressly governing direct and cross-examination in the context of an adversarial hearing. (Evid. Code, § 767.) It is entirely unclear why defendant believes such a rule has any application to a grand jury

28

proceeding, which is not an adversarial proceeding, does not include a right of confrontation, and does not include the direct or cross-examination of witnesses.

Likewise, the prosecutor's ability to communicate with a grand jury is not limited in the same way it would be to a petit jury during the course of a trial. By statute, the prosecutor is expressly authorized to provide information and advice in addition to interrogating witnesses. (§ 935.) Thus, the fact that the prosecutor makes comments or provides suggestions or advice unrelated to the direct questioning of a witness is not, in itself, indicative of misconduct.

Finally, it is hardly surprising that a grand jury proceeding encompasses testimony or evidence that, in retrospect, proves irrelevant to the charges contained in an indictment. The grand jury's role is, after all, investigatory, and the subjects it may investigate are broad. (§ 917.) The grand jury may initiate a criminal investigation leading to an indictment even without being presented with a target by the district attorney's office. (§ 918; *McGill v. Superior Court* (2011) 195 Cal.App.4th 1454, 1466; *Bradley v. Lacy* (1997) 53 Cal.App.4th 883, 892). Obviously, in the course of an investigation, the grand jury may inquire into matters that may ultimately not support an indictment.[12] Thus, the fact that, in retrospect, some of the evidence reviewed by the

---

[12] For example, in cases in which the grand jury's investigation leads to indictment of an individual not initially identified as a target, or in cases where the grand jury decides to return an indictment on only some, but not all, of the potential offenses investigated, the record will show that the grand jury reviewed evidence in addition to that which is relevant to the offenses alleged in any subsequent indictment.

grand jury can be characterized as irrelevant to the charges contained in a subsequent indictment is not an indication of prosecutorial misconduct.

Defendant's claim of fundamental unfairness is premised on an incorrect view of the grand jury proceeding. Such a proceeding is not the equivalent of a trial, and the fact that the prosecutor engaged in conduct that might be deemed unfair in the context of an adversarial trial does not establish that the grand jury proceeding was fundamentally unfair or suggest misconduct warranting the setting aside of an indictment.

C. *Sufficient Evidence in the Record Supports the Tolling Allegations Related to the Statute of Limitations*

Finally, defendant contends that the trial court's order may be partially affirmed on the alternative ground that the evidence was insufficient to show the statute of limitations had been tolled as to counts 2, 4, 6, 8, 10, and 12, corresponding with the alleged acts of bribery in 2012 and 2013. Again, we disagree.

Generally, a violation of section 67 is subject to a three-year statute of limitations. (§ 801.) However, the limitations period does not begin to run until discovery of the offense. (§ 803, subd. (c)(1).) "[I]n order to hold a defendant over for trial the People bear the burden of producing evidence . . . [,] which demonstrates that there is probable cause to believe that the prosecution is not barred by the statute of limitations.' [Citation.] . . . 'Lack of that evidence may be asserted . . . by a motion to set aside the indictment . . . ; at that point, the court confronts the general rule permitting it to quash only if there is no evidence from which the essential elements of proof can be inferred.' " (*People v. Fine* (1997) 52 Cal.App.4th 1258, 1263.)

Here, with respect to the payments allegedly constituting the 2012 and 2013 bribes, the People presented testimony that Pougnet disclosed the source of those payments as S.M.'s company and Meaney's company on his public disclosure forms. However, the source of any funds used by S.M. or Meaney to pay Pougnet would not have been public knowledge. Defendant has not explained how law enforcement investigators would have been able to link him to any payment to Pougnet without first being able to review the financial records of Pougnet, S.M., and Meaney. According to the testimony before the grand jury, search warrants to obtain access to this information were not issued until sometime after October 2016. Thus, the grand jury had evidence before it upon which it could reasonably infer that defendant's involvement could not have been discovered until sometime after investigators were able to obtain these documents, which was within a year of the filing of the criminal complaint by the People in February 2017.

This evidence was sufficient to support the tolling allegations in the indictment[13] and, as such, the statute of limitations does not offer an alternative ground to affirm the trial court's order dismissing the indictment in this case.

---

[13] In light of this conclusion, we deny defendant's request for judicial notice, filed August 19, 2021, of various documents that purportedly suggest defendant's involvement in the alleged offenses could have been discovered earlier. Even accepting defendant's characterization of these documents, at best it would show the evidence on the statute of limitations issue is in conflict. However, setting aside an indictment or information on statute of limitations grounds is only appropriate where the evidence is uncontradicted; and, where the evidence is "conflicting on the question, the court should deny the [section 995] motion because there has been no proof that the statute has run as a matter of law."

## IV. DISPOSITION

The order is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.

---

(*People v. Lopez* (1997) 52 Cal.App.4th 233, 250.)  Accordingly, the documents are not relevant to our consideration of this issue.